1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF WYOMING

3    _____

4    UNITED STATES OF AMERICA,          DOCKET NO. 15-CR-136-F

5           Plaintiff,

6           vs.
                                        Cheyenne, Wyoming
7    J.C. CHRISTOPHER PULHAM,           February 18, 2016
                                        2:27 p.m.
8               Defendant.

9

10   _____

            TRANSCRIPT OF SENTENCING PROCEEDINGS
11
        BEFORE THE HONORABLE NANCY D. FREUDENTHAL
12           CHIEF UNITED STATES DISTRICT JUDGE

13   APPEARANCES:
     For the Plaintiff:        JAMES C. ANDERSON
14                             Assistant United States Attorney
                               UNITED STATES ATTORNEY'S OFFICE
15                             2120 Capitol Avenue, Suite 400
                               P.O. Box 668
16                             Cheyenne, WY 82003-0668

17   For the Defendant:        JAMES H. BARRETT
                               Assistant Federal Public Defender
18                             OFFICE OF THE FEDERAL PUBLIC DEFENDER
                               214 West Lincolnway
19                             Suite 31-A
                               Cheyenne, WY 82001
20

21   Court Reporter:           Janet Davis
                               Registered Diplomate Reporter
22                             Federal Certified Realtime Reporter
                               Federal Official Court Reporter
23                             2120 Capitol Avenue, Room 2226
                               Cheyenne, WY  82001
24                             (307)635-3884/jbd.davis@gmail.com
     Proceedings recorded by digital stenography; transcript
25   produced with computer-aided transcription.

2

1                         I N D E X

2

OBJECTIONS TO PRESENTENCE REPORT                    PAGE
3
    Mr. Barrett                                       3
4

5     MOTIONS                                         PAGE

6     SPECIFIC OFFENSE CHARACTERISTICS
          Mr. Barrett                                 51
7         Mr. Anderson                                56
          Mr. Barrett                                 57
8         The Court                                   60

9
      GOVERNMENT'S WITNESS                            PAGE
10
      SHANNON REINERT
11        Direct - Mr. Anderson                       35
          Cross - Mr. Barrett                         44
12        Redirect - Mr. Anderson                     50

13

14    DEFENDANT'S WITNESSES                           PAGE

15    SUSAN JOHNSON
          Direct - Mr. Barrett                         8
16        Cross - Mr. Anderson                        14
          Redirect - Mr. Barrett                      18
17    TERRY PULHAM
          Direct - Mr. Barrett                        19
18        Cross - Mr. Anderson                        30

19

20    JUDGMENT AND SENTENCE                           PAGE

21        Mr. Barrett                                 68
          Mr. Anderson                                71
22        Mr. Barrett                                 75
          The Defendant                               78
23        Mr. Barrett                                 80
          The Court                                   80
24

25

1           (Proceedings commenced 2:27 p.m., February 18, 2016.)

2               COURTROOM DEPUTY:  In criminal matter Case

3   No. 15-CR-136-1-F, United States of America versus J.C.

4   Christopher Pulham, set today for sentencing.

5               Counsel, please state your appearances.

6               MR. ANDERSON:  Jim Anderson on behalf of the United

7   States.

8               MR. BARRETT:  Jim Barrett on behalf of Mr. Pulham.

9               THE COURT:  Good afternoon.

10              Mr. Barrett, have you had an opportunity to read and

11  discuss the Presentence Report filed in this case?

12              MR. BARRETT:  I have, Your Honor.

13              THE COURT:  Are there any factual issues concerning

14  the report?

15              MR. BARRETT:  There are, Your Honor.  Some affect --

16  one in particular affects the guideline calculation.  There are

17  some other clarifications I believe that should also be made to

18  keep some of this as near as possible to context.

19              The Presentence Report -- and you'll get to the major

20  objection last.  The Presentence Report at page 6, paragraph

21  28, indicates "Juvenile Adjudications," and that paragraph 28

22  indicates that the defendant has a juvenile rap sheet and gives

23  a number, reflecting an arrest on February 1, 1989 for forcible

24  sexual abuse of a child under age 14.  This matter did not

25  result in a juvenile adjudication, delinquency adjudication, or

1    for that matter, Your Honor, any adjudication whatsoever.

2            Mr. Pulham as a juvenile never appeared before any

3    juvenile court or committee for disposition, so there was no

4    adjudication either begun or completed.

5            It then says that he was placed in extended

6    counseling, the inference being that it was the result of some

7    form of adjudication or arrest.  He was placed in extended

8    counseling, that is not accurate either.  Mr. Pulham was placed

9    at -- in an institution for counseling on the recommendation of

10   his school and with the consent of his parents, part of which

11   we will be discussing later on.  It had nothing to do with the

12   arrest or any judicial or quasi-judicial recommendation.

13           Later on in the report there's also a statement by --

14   and repeated in the report by Mr. Pulham's sister Crystal that

15   he was in counseling for a number of months.  That's also not

16   true.  He was at the hospital for a period of 38 days total

17   beginning in late May of 1989.

18           The arrest that's referred to in paragraph 28, I don't

19   know how, where or why any authority created an arrest record

20   or any number on any official document, but that was in

21   relation to accusations that we will also be dealing with here

22   today in 1989 and dealing directly with accusations made by

23   Mr. Pulham's sister Crystal alleging hands-on offenses and

24   molestation by him and including rape of his sister Crystal and

25   his younger sister Susan.  His sister Crystal at the time would

1    have been 10 or 11 years old, at least that's what she says was

2    the end of the molesting.

3          So this had to do with a report to DFS in 1989.  There

4    is no official arrest, no official prosecution, no official

5    adjudication by DFS or any juvenile authority.  That's just for

6    purposes of clarification.

7          Now, the matter objected to and objectionable appears

8    at page 6.  Paragraph 17 is Specific Intent Characteristic,

9    that characteristic being that this defendant engaged in a

10   pattern of activity involving the sexual abuse of minors, that

11   he has at least three hands-on victims in Utah, and therefore,

12   five levels were added.

13         The alleged hands-on victims are a young lady by the

14   name of Jennifer Haines, Mr. Pulham's sister Crystal,

15   Mr. Pulham's sister Susan.  I'll address, I suppose, primarily

16   by way of argument, although we do have witnesses to present

17   here today, that will testify to this Court that with regard to

18   Crystal's verification to the probation officer of abuse --

19   Mr. Pulham's sister Susan is here.  She was allegedly raped.

20   She was examined, as was her older sister Crystal, and there

21   was found to be no evidence of sexual intercourse, even though

22   the older sister Crystal alleged that it happened not just

23   once, but many times.

24         Mr. Pulham's younger -- Crystal's younger sister Susan

25   is here today, and she will testify that she has searched and

DOCKET 15-CR-136-F          OBJECTIONS TO PSR                    6

1    searched her memory and cannot think of a single instance in

2    which Mr. Pulham molested her or acted inappropriately around

3    her.

4            I learned this morning that Ms. Hyde was apparently

5    interviewed.  Whether that will be a matter of testimony by the

6    Government, I don't know, but I suspect it will be.

7            Ms. Hyde reported in 1988 she had been in

8    counseling -- no mention of why she was in counseling -- but

9    during a period of counseling when she was a youngster she had

10   mentioned that she had been molested on a single occasion by

11   Mr. Pulham, and that's kind of where it wound up.  Parties were

12   notified; parents were advised; the children were kept apart,

13   and nothing further after that occurred with regard to that

14   allegation.

15           That allegation was solely that, an allegation.  There

16   was never any significant investigation of the charges.  It was

17   only later in 1989 that Mr. Pulham's sister Crystal alleged

18   that she had been raped for a number of years and a number of

19   times; most recently she had been molested countless times by

20   Mr. Pulham, even though at the time of Mr. Pulham's

21   hospitalization she approached the staff at the hospital and

22   withdrew those allegations, told them that they were not true.

23           Her statement in the Presentence Report and in later

24   interviews was that -- first in the presentence interview

25   report that she specifically told them, "I am being forced to

1  do this."  At page 9, paragraph 43:  "Deborah Pulham was upset

2  and made Crystal tell Benchmark" -- that's the hospital --

3  "that the abuse never happened.  Crystal finally relented.  She

4  told them, 'I am being forced to tell you the abuse never

5  happened.'  That day she ran away from home."

6          The later government interview indicates that Crystal

7  now says not that she was forced to, but that she was forced to

8  but never said that to the hospital staff.  What she really

9  said -- and I'll try and find the language.  Here it is.  What

10 she really said was this:  "That Crystal stated that she

11 recalls telling a staff member verbatim, quote, 'I'm supposed

12 to tell you the allegations I've made against Pulham are not

13 true.'  After hearing this, the employee asked, quote, 'They

14 aren't true?' to which Crystal angrily replied, quote, 'Listen.

15 Listen to me.  I'm supposed to tell you the allegations are not

16 true.'"

17         That's the latest version.  But in both versions she

18 withdrew the allegations.  And the hospital records indicate as

19 follows:  "That Mr. Pulham and his sisters had become

20 friendlier; that the group therapies or individual therapies

21 were never able to determine for certain whether or not sexual

22 abuse trauma had actually occurred.  However, it was deemed

23 unprovable at this time, and probably the patient was

24 accurate," in his denial.  Those are my words, "in his denial."

25 "Probably the patient was accurate since the sister had denied

1  after originally choosing that there was trauma or

2  molestation."  No indication there that any of the hospital

3  staff had been given any indication that that retraction was

4  anything less than voluntary.

5          Your Honor, I think we can -- with permission of the

6  Court, I would like to call Mr. Pulham's sister and

7  Mr. Pulham's father, who is also accused of -- not direct

8  unseemly conduct, but he's also accused in the Presentence

9  Report and later documents with having knowledge of molestation

10 occurring which he will deny.  With the Court's permission, I

11 would like to call Susan Pulham to the stand to address

12 those -- that issue with her.

13          THE COURT:  Please proceed.

14     (Witness sworn.)

15          COURTROOM DEPUTY:  Take a seat.  State and spell your

16 name for the record.

17          THE WITNESS:  My name is Susan Johnson, S-u-s-a-n

18 J-o-h-n-s-o-n.

19     SUSAN JOHNSON, DEFENDANT'S WITNESS, DIRECT EXAMINATION

20 BY MR. BARRETT:

21 **Q.**  Mrs. Johnson, at one time were you also known as Susan

22 Pulham?

23 **A.**  Yes.  I recently got married -- well, not recently, but --

24 almost two years ago.  Pulham is my maiden name.

25 **Q.**  And do you know the defendant in this case, J.C. Pulham?

1   **A.**   Yes.

2   **Q.**   How do you know him?

3   **A.**   He's my brother.

4   **Q.**   You grew up with your brother?

5   **A.**   Yes.

6   **Q.**   How did he treat you?

7   **A.**   Good.

8   **Q.**   Like a brother does?

9   **A.**   Yes.

10  **Q.**   All right.  You're aware of the accusations in this case?

11  **A.**   I am.

12  **Q.**   You're aware that your brother is accused of possession of

13  child pornography?

14  **A.**   I am.

15  **Q.**   You approve of that in any way?  Do you approve of that?

16  **A.**   Do I approve of --

17  **Q.**   Possession of child pornography?

18  **A.**   No.

19  **Q.**   Okay.  As part of the Presentence Investigation in this

20  matter it was alleged by someone named Crystal -- who would

21  that be?  Do you know a Crystal?

22  **A.**   Yes.

23  **Q.**   How do you know her?

24  **A.**   She's my older sister.

25  **Q.**   How much older?

1    **A.**  I believe eight years.

2    **Q.**  Okay.  And it was alleged by your older sister Crystal that

3    she had been molested and raped and had intercourse with your

4    brother J.C.  Are you aware of that?

5    **A.**  I'm aware of it.

6    **Q.**  She also alleged that you had been molested and that you

7    had -- and that J.C. had had some form of intercourse with you.

8    Are you aware of that?

9    **A.**  Yes.

10   **Q.**  Is that true?

11   **A.**  No.

12   **Q.**  Have you -- you were quite young at the time, or would have

13   been quite young, wouldn't you?

14   **A.**  Yes.

15   **Q.**  And have you searched your memory as best you can --

16   **A.**  I have.

17   **Q.**  -- to determine whether or not anything inappropriate may

18   have occurred?

19   **A.**  Right.

20   **Q.**  Have you been able to recall anything?

21   **A.**  I cannot remember anything happening.

22   **Q.**  What do you remember about your relationship with J.C.?

23   **A.**  Growing up?

24   **Q.**  Yes.

25   **A.**  We had a very close relationship.

DOCKET 15-CR-136-F          JOHNSON - DIRECT                    11

1  **Q.**  Can you give us an example of how that was?

2  **A.**  I -- he was -- we were really good friends.  I would go to

3  him for advice.  We hung out a lot.

4  **Q.**  Did your sister Crystal ever ask you to report any

5  inappropriate conduct to your parents?

6  **A.**  She did.

7  **Q.**  Can you describe that to the Court?

8  **A.**  One evening she came to me and took me into her bedroom and

9  sat me down on her bed and told me that she needed me to go

10  tell our parents a story and she --

11  **Q.**  What sort of story?

12  **A.**  About my brother J.C.

13  **Q.**  What about him?

14  **A.**  That he was touching us and that -- in her words that she

15  used for me, that he was trying to put his wee wee in us and

16  that our parents didn't believe her but they would believe me,

17  so I needed to go tell them.

18  **Q.**  And what did you do?

19  **A.**  She pushed me down the hall to our parents' bedroom.

20  **Q.**  And what happened next?

21  **A.**  I went in.  I was scared.  And I woke up my father.

22  **Q.**  Did you tell your father anything?

23  **A.**  I told them the story that Crystal had asked me to tell.

24  **Q.**  Okay.  And what did your father do or say?

25  **A.**  I remember him looking concerned, but honestly after that I

1   don't remember what he did.  I just remember telling him,

2   waking him up.

3   **Q.**  Was this at about the time that the accusations were made

4   against J.C. at school and with the police?

5   **A.**  I want to say yes, but I don't --

6   **Q.**  You don't recall precisely?

7   **A.**  -- remember?  (Witness nods head.)

8   **Q.**  But what you reported to your father wasn't true?

9   **A.**  Right, it was not.

10  **Q.**  And there came a time that there was an investigation by

11  Department of Family Services in Utah in, I think, 1989.  Do

12  you recall that period of time generally?  Do you recall an

13  investigation?

14  **A.**  I -- I don't recall an investigation.  I don't remember

15  talking to anybody.

16  **Q.**  It had been -- the accusation had been made that you were

17  abused.  Did you later become aware of that?

18  **A.**  Yes.

19  **Q.**  Did anybody from DSF -- DFS ever interview you?

20  **A.**  No.

21  **Q.**  But you were taken for a physical examination, weren't you?

22  **A.**  Yes.

23  **Q.**  Who arranged for that?

24  **A.**  My parents.

25  **Q.**  And you were examined?

1    **A.**  Yes.

2    **Q.**  And your older sister Crystal was examined?

3    **A.**  Yes.

4    **Q.**  Do you know what the results of that examination were?

5    **A.**  That nothing had happened to us and we were intact down

6    there.

7    **Q.**  There was no evidence of intercourse?

8    **A.**  Right.

9    **Q.**  At any other time did anyone from DFS ever talk to you

10   about these events or these allegations?

11   **A.**  No.

12   **Q.**  Now, your sister Crystal was also undergoing some form of

13   counseling, wasn't she?

14   **A.**  At that time or --

15   **Q.**  Or later.

16   **A.**  As an adult I know she did go to counseling.

17   **Q.**  And did you accompany her to those sessions?

18   **A.**  I accompanied her, yes, but I did sit out in the waiting

19   room.  I did not go into the room with her.

20   **Q.**  Okay.  You didn't participate in the counseling, but you

21   transported -- took her back and forth?

22   **A.**  Yes.

23   **Q.**  And did she ever disclose to you what diagnosis, if any,

24   was made of her condition?

25   **A.**  She did.

1   **Q.**  What was that?

2   **A.**  She told me after one session that her doctor had just

3   diagnosed her as a paranoid schizophrenic.

4   **Q.**  Was she placed on any medications that you're aware of?

5   **A.**  Yes.

6   **Q.**  And did she take them?

7   **A.**  Yes.

8   **Q.**  And this was some time following these allegations -- the

9   allegations of abuse, as far as you know?

10  **A.**  Yes.

11  **Q.**  All right.

12          MR. BARRETT:  I believe that's all I have.  Thank you.

13          THE COURT:  This witness is passed for any questioning

14  by Government.

15          MR. ANDERSON:  Questions, Your Honor.

16                          CROSS-EXAMINATION

17  BY MR. ANDERSON:

18  **Q.**  Mrs. Johnson, where do you live?

19  **A.**  In Payson, Utah.

20  **Q.**  You stated that you have a very close relationship with

21  your brother?

22  **A.**  Yes.

23  **Q.**  And, in fact, you've been here for every one of his court

24  hearings, as I recall?

25  **A.**  Yes, I have.

DOCKET 15-CR-136-F              JOHNSON - CROSS                          15

1   **Q.**  Where's Mr. Pulham's wife today?

2   **A.**  J.C. Pulham's wife?

3   **Q.**  Yes.

4   **A.**  At home in Evanston.

5   **Q.**  Has she been to any court hearings?

6   **A.**  No.

7   **Q.**  You said that you have this close relationship with your

8   brother.  When was the last time you were at his house?

9   **A.**  At -- yesterday.

10  **Q.**  Before his arrest how close in proximity to the time that

11  he was arrested had you been in his house?

12  **A.**  Maybe a year.

13  **Q.**  Were you aware that one of the officers while searching his

14  house became so ill by the smell and the condition of the house

15  that he vomited?

16  **A.**  No, I was not.

17  **Q.**  Were you aware that one of Mr. Pulham's children were

18  removed from his care due to the condition of the house?

19  **A.**  It was told to me after his arrest, but I was not aware of

20  it before.

21  **Q.**  And that's the individual that you seek out for advice and

22  guidance; is that correct?

23  **A.**  Yes, it is.

24  **Q.**  Who all -- else lives in the Evanston area of your family?

25  **A.**  J.C., his wife and his four kids.

1  **Q.**  Anyone else of your extended family; other sisters,

2  brothers, your parents?

3  **A.**  No, no.

4  **Q.**  In regards to the allegations that were leveled against

5  your brother, was, in fact, your brother removed from your

6  house for a period of time while you were a child?

7  **A.**  Yes.

8  **Q.**  And he was taken to a facility that was operated by an

9  organization known as Benchmark; is that correct?

10  **A.**  Yes.

11  **Q.**  And are you aware that Benchmark at that time was providing

12  psychiatric services and treatment to troubled children?

13  **A.**  No, when I was a kid I did not understand why he was gone.

14  **Q.**  I understand that.  You've said a lot of things about what

15  was going on in the house, but I was asking you, were you aware

16  that Benchmark was a facility for the care and treatment of

17  children who were emotionally troubled?

18  **A.**  No, I did not know what Benchmark was.

19  **Q.**  How long had he been out of your home, to the best of your

20  knowledge and belief?

21  **A.**  I don't actually remember.  For me, it felt like a couple

22  of weeks.

23  **Q.**  In regards to the situation with your sister Crystal, how

24  often are you in contact with your sister now?

25  **A.**  I am not.

DOCKET 15-CR-136-F          JOHNSON - CROSS                    17

1   **Q.**  You're not.  When was the last time you were in contact

2   with your sister?

3   **A.**  This is February.  About two years ago.

4   **Q.**  Are you aware of what your sister does for a living?

5   **A.**  Vaguely.

6   **Q.**  And what is that?

7   **A.**  She works with -- I want to say it's troubled youth, but

8   I'm not sure.

9   **Q.**  So she's entrusted with the care and the responsibility of

10  caring for troubled youth?

11  **A.**  Sure.

12  **Q.**  Now, in regards to the statements that you've previously

13  made, at the time that all of this was going on with your

14  brother and Crystal telling people that she had been sexually

15  assaulted by her brother, approximately how old were you?

16  **A.**  Between 3 and 4, I believe.

17  **Q.**  And your testimony here is today that you have a clear,

18  crystal-clear recollection of your sister asking you to lie to

19  your parents?

20  **A.**  I do.

21  **Q.**  At the age of 3 or 4?

22  **A.**  Yes.

23       MR. ANDERSON:  I don't have anything else, Judge.

24  Thank you.

25           THE COURT:  Any redirect?

1                        REDIRECT EXAMINATION

2    BY MR. BARRETT:

3    **Q.**  Your sister is a juvenile corrections officer, a jailer in

4    Texas, did you know that?

5    **A.**  No.

6    **Q.**  Now, with regard to Benchmark and troubled children, were

7    you aware at that time -- at that time -- at the time of your

8    brother's admission or now that his discharge diagnosis was

9    generalized anxiety disorder, major depression, single episode,

10   possible sexual abuse trauma of childhood with post-traumatic

11   stress disorder?  Did you know that?

12   **A.**  No.

13   **Q.**  Did you ever know that?

14   **A.**  No.

15   **Q.**  Okay.  Are you aware of any finding by any treating

16   physician, counselor, or psychologist of your brother having

17   committed a sexual assault on you, your sister or any other

18   party?

19   **A.**  No.

20   **Q.**  So, far as you know, your brother's house in Evanston is,

21   being charitably put, a mess.  Did that have anything to do

22   with the accusations in 1988 or '89?

23   **A.**  No.

24   **Q.**  Any of that have anything to do with that?

25   **A.**  No.

DOCKET 15-CR-136-F          PULHAM - DIRECT                    19

1            MR. BARRETT:  That's all I have, Your Honor.

2            May the witness be excused.

3            MR. ANDERSON:  Of course.

4            THE COURT:  You may step down.  You're excused.  Thank

5     you.

6            Mr. Barrett, if I remember right, you had another

7     witness you wished to call.

8            MR. BARRETT:  One other, Your Honor, Mr. Terry Pulham.

9            THE COURT:  All right.

10       (Witness sworn.)

11           COURTROOM DEPUTY:  Please take a seat, state and spell

12    your name for the record.

13           THE WITNESS:  Name is Terry Pulham, T-e-r-r-y

14    P-u-l-h-a-m, middle name Sanders.

15       TERRY PULHAM, DEFENDANT'S WITNESS, DIRECT EXAMINATION

16    BY MR. BARRETT:

17    **Q.**  And where do you live?

18    **A.**  I live in Payson, Utah.

19    **Q.**  And you're acquainted with the defendant, J.C. Pulham?

20    **A.**  Yes.

21    **Q.**  How do you know him?

22    **A.**  I call him my son.  He's actually my stepson.

23    **Q.**  Now, you're aware, are you not, of the pending charges for

24    which your stepson is here to be sentenced?

25    **A.**  Yeah.

1  **Q.**  Do you approve of that conduct in any way?

2  **A.**  No, I don't.

3  **Q.**  Do you excuse that conduct in any way?

4  **A.**  Nope.

5  **Q.**  You're also aware, are you not, that allegations were made

6  in 1988 and '89, particularly 1989 that we're aware of --

7  **A.**  Yes.

8  **Q.**  -- that one Crystal Pulham --

9  **A.**  Also my stepdaughter.

10  **Q.**  -- had been sexually abused for a period of years?

11  **A.**  Yes, that's --

12  **Q.**  And did Crystal make any accusations or allegations as well

13  that Mr. Pulham had sexually abused her younger sister Susan?

14  **A.**  Yes.

15  **Q.**  And when you heard that, what was your reaction?

16  **A.**  I was kind of flabbergasted and, you know, very much

17  concerned about the allegations.  I, you know -- a son and a

18  daughter, I didn't want to basically throw either one of them

19  under the bus, so to speak.  I was concerned, so I consulted

20  with my ex-wife Debbie and made arrangements for them to be

21  examined by a doctor that, I guess, dealt with sexual abuse.

22          And so we, you know, took the girls and had them

23  examined and were told by the doctor that they were still

24  virgins.

25  **Q.**  Were these examinations in part in cooperation with the

DOCKET 15-CR-136-F            PULHAM - DIRECT                    21

1    Department of Family Services of Utah?

2    **A.**  I don't really think so.  It was just we went on our own.

3    Then as part of, I guess, the examination, arrangements were

4    made for them to go to some counseling there in the complex

5    where the doctor's office was.

6    **Q.**  Okay.  Were you aware that the results of that physical

7    examination were provided to or made known to Department of

8    Family Services?

9    **A.**  I -- I didn't really recall.

10   **Q.**  Specifically, that on May 1st, 1989, Family Services phoned

11   to Dr. Freestone who advised that there's no evidence of sexual

12   intercourse on either one of the girls?

13   **A.**  Yeah.

14   **Q.**  He goes on to opine without any stated basis that there may

15   have been sexual contact but no penile penetration, but they

16   were intact individuals?

17   **A.**  Yes.

18   **Q.**  That was reported to you?

19   **A.**  Yeah.

20   **Q.**  Anything else reported to you?

21   **A.**  Well, he stated that he couldn't say for sure that there

22   wasn't any touching.  There was no way to prove that.

23   **Q.**  But certainly there was no evidence of the intercourse and

24   penetration that Gail [sic] --

25   **A.**  Well, at times Crystal made the allegations that he raped

1   her -- Crystal, sorry -- and that he was continually having

2   sexual intercourse with her.

3   **Q.**  So you wanted to have that checked?

4   **A.**  Yeah.

5   **Q.**  You did?

6   **A.**  Yeah.

7   **Q.**  And it turned out apparently not to be the case?

8   **A.**  Not to be the case.

9   **Q.**  Has J.C. ever admitted to anyone that you're aware of that

10  any of these activities occurred?

11  **A.**  No.

12  **Q.**  He has consistently denied any of that?

13  **A.**  Consistently denied it.

14  **Q.**  Now, your daughter Crystal in the Presentence Report at

15  page 9, paragraph 42, indicates as follows, and I quote:  "The

16  probation officer spoke with Crystal Pulham who verified that

17  she, her sister Susan and friend Jessica Hyde had been

18  victimized sexually by the defendant.  Her father, Terry

19  Pulham, has related to her that the first time he observed

20  inappropriate sexual contact between Crystal and the defendant

21  occurred when Crystal was 4 years old and the defendant was 7

22  years old."

23         Did you ever make that statement to Crystal?

24  **A.**  I told her an instance when they had got out of, you know,

25  the bathtub and were chasing each other, you know, around the

1  house, you know, kind of playing.  But I really didn't see

2  anything sexual.  But I was uncomfortable with it, you know.

3  That was, you know -- J.C. was 6 and Crystal was like 3 when I

4  married their mother, and so being a, you know, new parent, I

5  was a little bit uncomfortable with the playing around while

6  they were naked.

7  **Q.**  Okay.  But she's indicating to the probation officer,

8  Mr. Olive, that you observed inappropriate sexual contact.  Did

9  you ever observe inappropriate sexual contact --

10  **A.**  No.

11  **Q.**  -- between Crystal and J.C.?

12  **A.**  No.

13  **Q.**  At any time?

14  **A.**  No.

15  **Q.**  Did you ever tell her that?

16  **A.**  I told her about them running around the house naked.

17  **Q.**  Okay.  But no inappropriate sexual contact?

18  **A.**  No.

19  **Q.**  Now, this referral to Benchmark, who made that?

20  **A.**  I got a call -- I don't remember the date -- but his

21  counselor from school called me and said that J.C. was very

22  upset and acting suicidal from accusations from Crystal that he

23  was molesting and sexually, you know, I guess --

24  **Q.**  As a result of that report, what did you do?

25  **A.**  Well, the counselor told me that they had been -- had made

DOCKET 15-CR-136-F            PULHAM - DIRECT                    24

1   contact, I guess, with DFS which is, you know, their

2   responsibility if that kind of thing was brought up.  And then

3   the -- I'm not sure if it was the counselor or the DFS person

4   that -- I guess it was DFS that told me they had made

5   arrangements to send J.C. to Benchmark for an evaluation and

6   would -- she said she'd made the arrangements and asked if they

7   could go ahead and, you know, send him to Benchmark.

8   **Q.**  And did you say okay?

9   **A.**  Yes.

10  **Q.**  All right.

11  **A.**  Well, they told me they made the right arrangements, but

12  they didn't follow through with my doctor and so basically I

13  had to declare bankruptcy because of it.

14  **Q.**  Okay.  Because of the bills as a result of that?

15  **A.**  Yeah, it was $36,000 for, what, 30-some odd days.

16  **Q.**  Not months?

17  **A.**  No.

18  **Q.**  38 days?

19  **A.**  I guess that was --

20  **Q.**  Give or take?

21  **A.**  Yeah.

22  **Q.**  All right.  And you were burdened with that bill and filed

23  bankruptcy, then?

24  **A.**  Well, it forced me into -- well, after the divorce from,

25  you know, my ex-wife and basically everything was dumped on me

1  and they started garnishing my wages, so I had to file

2  bankruptcy.

3  **Q.**  Were you ever advised by DFS, the school or law enforcement

4  that this placement at Benchmark was in lieu of or a substitute

5  for going to jail?

6  **A.**  No.

7  **Q.**  So if Crystal were to report that J.C., age 16, was

8  admitted to a facility referred to by Crystal as Benchmark, a

9  behavioral counseling center, in lieu of jail, that wouldn't be

10  correct?

11  **A.**  No.  No, it was my understanding, you know, he was given

12  counseling because of his state of mind, plus they were, I

13  guess, testing him to see if he had those kind of tendencies.

14  **Q.**  When you say counseling because of his state of mind, what

15  were you told about that?

16  **A.**  Well, I was told that he was suicidal.  I was a concerned

17  parent.

18  **Q.**  Now, again, referring to Crystal and her allegations or

19  reports about what is occurring while J.C. is at Benchmark, at

20  page 9, paragraph 43 of the Presentence Report it is reported

21  that after disclosures and her brother was involved in

22  treatment at Benchmark Behavioral Health for a few months -- he

23  was only there 30-some days, not a few months?

24  **A.**  Yeah.

25  **Q.**  -- that I guess it was your -- would have been your ex-wife

1  Deborah Pulham --

2  **A.**  Yeah.

3  **Q.**  -- was upset and called -- and made Crystal tell Benchmark

4  staff that the abuse never happened.

5         Did you witness or were you aware of any such kind of

6  contact?

7  **A.**  I was -- I was not aware of any of that, if it -- I was not

8  aware if it did or did not occur.

9  **Q.**  Were you -- did you visit J.C. while he was at Benchmark?

10 **A.**  We went up there, I believe it was either on a Friday or --

11 about once a week.

12 **Q.**  And who is the we?

13 **A.**  The whole family.

14 **Q.**  And who would that have been?

15 **A.**  Would have been Debbie and I and Crystal and Susan and

16 Terry.

17 **Q.**  And so Crystal -- the family was together during these

18 visits?

19 **A.**  Yes.

20 **Q.**  Did you ever hear any effort by anyone to cause Crystal --

21 or make Crystal withdraw an accusation?

22 **A.**  No.

23 **Q.**  Do you believe that that occurred?

24 **A.**  (Witness shakes head.)

25 **Q.**  You didn't hear that?

DOCKET 15-CR-136-F          PULHAM - DIRECT                    27

1   **A.**  I didn't hear that.

2   **Q.**  Okay.

3   **A.**  I didn't know that she had withdrawn statements.

4   **Q.**  Was J.C. ever charged with any offense?

5   **A.**  As far as I knew, no.

6   **Q.**  Okay.

7   **A.**  I just assumed that he would either -- you know, with their

8   findings they would charge him and remove him from the home or,

9   you know -- which never happened, so -- and no, as far as I

10  knew, no charges were ever brought against him.

11  **Q.**  He was never placed in juvenile custody, never under

12  supervision?

13  **A.**  No.

14  **Q.**  Okay.  And never any further complaints of anything?

15  **A.**  No.

16  **Q.**  The -- Crystal also indicates that her -- that parental

17  rights were terminated with regard to her when she was 14

18  shortly after these allegations.  Do you recall any such event?

19  **A.**  During my -- the divorce between Debbie and I both J.C. and

20  Crystal were -- I forget the term where they basically put them

21  out on their own.

22  **Q.**  Emancipated?

23  **A.**  Emancipated.  And, you know, I asked Debbie why she did

24  that and she just said that, you know, Crystal wasn't there and

25  J.C. was old enough to be on his own.

1  **Q.** Crystal references in a later interview being involved with

2  a, quote, unquote, "cocaine dealer" as a result of this

3  termination or emancipation.  Do you know what that's about?

4  **A.** No -- well, she started pressuring us to let her spend the

5  night over at her girlfriend's house, and, you know, we

6  occasionally would let her do that.  And then she wanted to

7  spend more time and more time there, and, you know, we were

8  starting to get a little uncomfortable with that.

9          I got -- I got a call one evening and it was the Orem

10  police calling to say that Robert had been -- her girlfriend's

11  father -- had been picked up for drunk driving and that Crystal

12  was in the car with him and she was sitting next to him like a

13  girlfriend.  And, you know, that made me quite uncomfortable.

14  So I through my work -- I work for BYU as a landscaper --

15  talked with a counselor there and he told me that, you know, by

16  consulting with him that he would call DFS to see if there was

17  something going on.

18          Then I don't know how much longer I got a call from my

19  bishop and, you know, Debbie and I were asked to come down and

20  talk to him.  And he told me of incidents where one of the

21  persons in our ward had been out pheasant hunting and saw

22  Crystal and this guy having sex in the back of the truck.

23  **Q.** But, in any event, you didn't throw her out of the house?

24  **A.** No.  But I don't know if Debbie was trying to, you know,

25  shield me.  I -- I believe Debbie wrote a piece of paper giving

1  this Robert guy permission to cross state lines with her, so I

2  don't know if that's signing away her rights.

3  **Q.**  Okay.  But your ex-wife did that?

4  **A.**  She did that.

5  **Q.**  Did --

6  **A.**  And then I asked her, you know --

7          THE COURT:  Mr. Pulham, there's no question pending.

8  BY MR. BARRETT:

9  **Q.**  Did Crystal ever describe to you what she characterized as

10 her first sexual experience?

11 **A.**  Unfortunately, I don't know -- it was in a conversation,

12 you know, years later, and she just come out and -- I don't

13 know if she was trying to embarrass me or what.  She come out

14 and told me that her first sexual experience was with a Mexican

15 kid from school and she said it hurt like hell.

16          I don't know why she told me that, you know.  And I

17 guess in the court of law that's just hearsay.

18 **Q.**  Well, we'll worry about that later.

19 **A.**  But it did embarrass the heck out of me.

20 **Q.**  Yeah.  So she didn't describe any sexual experiences with

21 J.C., then?

22 **A.**  No.

23 **Q.**  Of any kind?

24 **A.**  No.

25 **Q.**  And so far as you know, when J.C. was at the -- was

1  hospitalized, she withdrew any allegations of rape?

2  **A.**  I knew nothing about that.

3          MR. BARRETT:  All right.  I have nothing further, Your

4  Honor.  Thank you.

5          THE COURT:  Thank you.

6          MR. BARRETT:  There will be some questions by

7  Mr. Anderson here.

8          THE WITNESS:  Oh, okay.

9          THE COURT:  Mr. Anderson, this witness is passed for

10 any questioning by the Government.

11                       CROSS-EXAMINATION

12 BY MR. ANDERSON:

13 **Q.**  I take it that it is your testimony and you want the Court

14 to believe that your son J.C. here was hospitalized at

15 Benchmark because he had been victimized by his younger sister

16 Crystal?

17 **A.**  You know, that -- out of concern I didn't want to throw her

18 under the bench [sic] or --

19 **Q.**  Well, you have.  You already have, Mr. Pulham.  Let's get

20 it straight.  Your testimony --

21         MR. BARRETT:  I will object to that as argumentative

22 and an improper form of question, Your Honor.

23         MR. ANDERSON:  I will withdraw.

24         THE COURT:  Overruled.  Please continue.

25 BY MR. ANDERSON:

1  **Q.** Mr. Pulham, is it your testimony that your son J.C. went to

2  Benchmark because he had been victimized by his younger sister

3  Crystal, yes or no?

4  **A.** If you put it that way, yeah, I guess.

5  **Q.** All right. We'll take it that way.

6       Now, Mr. Pulham, I understand that a few years ago

7  Crystal allowed her children to come visit you; is that

8  correct?

9  **A.** Yeah. I was living in Provo after the divorce.

10 **Q.** And you recall her telling you that if you let J.C. around

11 her children she was going to burn him and watch his flesh fall

12 from his body if she found out that you left her children alone

13 with J.C. Do you recall her telling you that?

14 **A.** No.

15 **Q.** So that would be something she made up?

16 **A.** She didn't tell it to me, so. . .

17 **Q.** Now --

18 **A.** The only thing I remember is she brought -- when Katrina

19 and J.C. were living there with me, she brought -- she had her

20 daughter there and had given her a bath and was chasing her

21 around, you know, and telling, you know, she had a cute looking

22 butt.

23 **Q.** What I asked you, Mr. Pulham, was about whether or not your

24 daughter said, "Don't let my children around J.C. Pulham"?

25 **A.** No.

DOCKET 15-CR-136-F                PULHAM - CROSS                          32

1    **Q.** That's not --

2    **A.** At the time, no.

3    **Q.** The next question I've got for you is do you recall telling

4    your daughter Crystal that your son had been arrested for

5    indecent exposure and masturbating in public?

6    **A.** No.

7    **Q.** That didn't happen?

8    **A.** There was some incident in Spanish Fork, but I knew not

9    what the charges or anything was about.

10   **Q.** So you didn't tell your daughter about that --

11   **A.** No.

12   **Q.** -- when she told you she didn't want her children around

13   J.C.?

14   **A.** No.

15   **Q.** Now, how often do you see J.C.?

16   **A.** Off and on every, what, three or four months or so.

17   **Q.** You go up to Evanston and visit, do you?

18   **A.** Yeah, we come up and visit and and Susan and her

19   boyfriend -- husband used to come up and visit.

20   **Q.** Before the arrest, when was the most recent time you had

21   visited Mr. Pulham?

22   **A.** Sometime the previous summer.

23   **Q.** Go to his house, did you?

24   **A.** Yeah.

25   **Q.** Anything out of the ordinary?

1   **A.**  Not that I recall.

2   **Q.**  Now, Mr. -- Mr. Barrett asked you about Crystal, if you

3   had -- Crystal's let her children come visit you; is that

4   correct?

5   **A.**  Yeah.

6   **Q.**  Where is she living now?

7   **A.**  She lives down in, I believe it is, Brownwood, Texas.

8   **Q.**  And what does she do for a living?

9   **A.**  I guess now she's working at a juvi lockup.

10  **Q.**  Juvenile detention center?

11  **A.**  Yeah.

12  **Q.**  What type of job does she have?

13  **A.**  I guess she's some kind of guard.

14  **Q.**  You don't know -- do you know what she does?

15  **A.**  Well, that's what she told me, she was a guard.

16  **Q.**  So just so we get it straight, the only reason that J.C.

17  went to that facility at Benchmark that you had to pay for was

18  because his sister was making these allegations against him and

19  he was suicidal?

20  **A.**  Well, I was concerned, yes.

21  **Q.**  He had been victimized by his sister?

22  **A.**  If that's the way you want to put it.

23  **Q.**  Is that the way you want to put it?

24  **A.**  I really don't, but that's --

25  **Q.**  But that's what you want the Court to believe?

DOCKET 15-CR-136-F                PULHAM - CROSS                    34

1    **A.**  Well, I allowed him to, you know, under advice from DFS be

2    taken to that facility and them to do their investigation and

3    whatever.

4    **Q.**  Now, it wasn't just Crystal that was making allegations

5    against your son, was it?

6    **A.**  At that time, as far as I know, it was just Crystal.

7    **Q.**  Somebody else made allegations that your son had molested

8    them as well during that time frame; isn't that correct?

9    **A.**  I had heard, I guess, Jessica.

10   **Q.**  Jessica Hyde?

11   **A.**  Yeah.  They lived up around the block.

12   **Q.**  They were up around the block?

13   **A.**  (Witness nods head.)

14   **Q.**  What do you know about Jessica Hyde?

15   **A.**  Just that I guess she made an accusation.

16   **Q.**  Just that she made an accusation.  Do you know anything

17   else about her?

18   **A.**  Not really.

19   **Q.**  And what happened with that allegation?

20   **A.**  Apparently nothing.

21   **Q.**  Apparently nothing.  Didn't concern you?

22   **A.**  Well, I assumed that DFS and if there was any indication

23   that they would have my son taken out of the home and locked

24   up, and so. . .

25           MR. ANDERSON:  I don't have anything else, Judge.

DOCKET 15-CR-136-F          REINERT - DIRECT                    35

1          MR. BARRETT:  Nothing further.  Thank you.

2          We have no further witnesses, Your Honor.

3          THE COURT:  All right.  It seems like we've -- we're

4   on the topic of the enhancement in the guideline.

5          Does the Government have any case?

6          MR. ANDERSON:  Yes, Your Honor.  I would like to call

7   Shannon Reinert to the stand.

8       (Witness sworn.)

9          COURTROOM DEPUTY:  Please take a seat.  State and

10  spell your name for the record.

11         THE WITNESS:  Shannon Reinert, S-H-A-N-N-O-N

12  R-E-I-N-E-R-T.

13    SHANNON REINERT, PLAINTIFF'S WITNESS, DIRECT EXAMINATION

14  BY MR. ANDERSON:

15  **Q.**  Miss Reinert, what do you do for a living?

16  **A.**  I'm a Special Agent with Homeland Security investigations.

17  **Q.**  What's your current assignment?

18  **A.**  I'm currently assigned to the Wyoming Internet Crimes

19  Against Children Task Force.

20  **Q.**  Pursuant to your duties and responsibilities with the

21  Wyoming Internet Crimes Against Children Task Force, are you

22  familiar with the case before the Court, that is, United States

23  of America versus J.C. Pulham?

24  **A.**  Yes, sir, I am.

25  **Q.**  Are you the case agent in this matter?

1   **A.**  Yes, sir, I am.

2   **Q.**  Pursuant to your duties and responsibilities as the case

3   agent in this particular matter, have you conducted or -- have

4   you conducted interviews of individuals in an attempt to learn

5   about the defendant's past?

6   **A.**  Yes, sir, I have.

7   **Q.**  Are you familiar with Crystal Pulham?

8   **A.**  I am.

9   **Q.**  Indeed, were you asked by myself to interview Ms. Pulham

10  concerning the topic of conversation we've had before the Court

11  here this afternoon, that is, whether or not sexual abuse was

12  visited upon her or perpetrated upon her by her brother J.C.?

13  **A.**  Yes, sir.

14  **Q.**  When did that interview take place?

15  **A.**  February 5th of this year.

16  **Q.**  And could you tell us, please, prior to February of 2016,

17  were you aware generally during the course of your initial

18  investigation of the defendant, indeed, up until the time that

19  he changed his plea in this particular matter, that there were

20  allegations of sexual abuse perpetrated by him upon siblings or

21  others during childhood years?

22  **A.**  No, sir, I was not.

23  **Q.**  Did you have any way to learn of that through the check --

24  through checking public databases such as NCIC or other law

25  enforcement databases?

1   **A.**   No, sir.

2   **Q.**   How was it that you learned that there were allegations

3   being made of that sort or allegations had been made of that

4   sort against Mr. Pulham?

5   **A.**   I learned of it through the presentencing process from U.S.

6   Probation.

7   **Q.**   And that would have been the Presentence Report that was

8   conducted by Mr. Olive?

9   **A.**   Yes, sir.

10  **Q.**   So on February 5th you interview Crystal Pulham.  Tell us a

11  little bit about that interview.  Was it face to face?

12  **A.**   No, sir, it was telephonic.

13  **Q.**   At the time that you interviewed Ms. Pulham, where was she?

14  **A.**   She was in Texas, sir.

15  **Q.**   What did she tell you she was doing for a living these

16  days?

17  **A.**   She told me that she was a corrections officer in a

18  juvenile detention facility in Texas.

19  **Q.**   Did she tell you anything about what type of work that she

20  was doing in regards to the corrections work?

21  **A.**   She imparted to me that she was a guard at the prison and

22  oftentimes would act as a mentor towards the children that she

23  was tasked with guarding.

24  **Q.**   Did the conversation at some point turn to her relationship

25  with her brother?

DOCKET 15-CR-136-F          REINERT - DIRECT                    38

1   **A.**  It did.

2   **Q.**  Tell us about what she told you in regards to any sort of

3   sexual activity that she might have had with her brother?

4   **A.**  Crystal imparted to me that her relationship with her

5   brother was very sexually charged, using her words.  She told

6   me that from a very young age regular childhood games would

7   take on a sexual slant to them.  She recalled times when they

8   would play Marco Polo and J.C. would have them do so nude.  She

9   also imparted to me that J.C. acted somewhat as a ring leader

10  among the siblings and childhood friends wherein he would

11  either have children act out upon one another sexually and

12  watch for his enjoyment, or would offer her up to his friends

13  for sexual purposes wherein he would watch them perform

14  together.

15          She also imparted to me that she could recall from the

16  age of 4 and a half up through the age of 12 interactions being

17  sexual, the most egregious one that she described to me she

18  said that J.C. would spread the lips of her vagina and place

19  his penis upon it.

20  **Q.**  Did she ever describe intercourse or activity that would

21  constitute sexual intercourse, the insertion of his penis in

22  her vagina?

23  **A.**  No, she was very clear that there was no penetration that

24  she could recall.

25  **Q.**  Did she say that this type of activity occurred on more

1   than one occasion?

2   **A.**  Yes, sir.

3   **Q.**  Did she tell you anything about the circumstance -- how she

4   revealed or did she ever disclose this activity to anyone?

5   **A.**  She did.  She recalled that at the age of 12 she had been

6   out with some friends at the mall or some other place out of

7   the home, and when she returned home, she found her father in

8   the front room area by himself at which point she had asked

9   where her sister Susan was.  Her father replied that he wasn't

10  sure where she was, at which point she recalled having gone to

11  J.C.'s bedroom door and found it locked and started knocking on

12  it and told me that with her father's help she was able to get

13  the door open.

14          At the point that the door opened, she said that J.C.

15  and a neighborhood boy were in the room with her sister Susan

16  and that both boys were in the act of pulling up their pants

17  when the door was opened.

18  **Q.**  In regards to subsequent events in the house, what did

19  Crystal relate to you once the disclosure had been made where

20  this incident occurred?

21  **A.**  She recalled and told me that at that point J.C. had gone

22  to a facility that she referred to as Benchmark, and how she

23  explained that facility to me was that it was a behavioral

24  counseling center.  Once at Benchpoint -- excuse me --

25  Benchmark, Crystal told me that she was forced by her mother to

1  approach the Benchmark staff and tell them that everything that

2  she had alleged in regards to sexual activity against her

3  brother were untrue.

4  **Q.**  And why did she say she did that?

5  **A.**  To appease her mother.  She was forced.

6  **Q.**  And mother's name was?

7  **A.**  I believe it was Deborah.

8  **Q.**  In regards to Ms. Pulham's recounting of these incidents to

9  you, what was her affect during this period of time, during

10 this interview?

11 **A.**  She was very emotional.  There were several times in our

12 conversation where we'd have to pause and she would need to

13 collect herself.  And she was very angry.

14 **Q.**  Do you recall her relating to you an incident where she

15 entrusted her children to her father?

16 **A.**  I do.

17 **Q.**  Tell us about that, please.

18 **A.**  Crystal told me that approximately five years ago she had

19 allowed her children to visit their grandfather and when she

20 learned that J.C. might be in proximity of her children and

21 grandfather, she told me that she told her father that if J.C.

22 were to come into contact or have any alone time with her

23 children, she would set him on fire and watch his flesh fall

24 from his body.

25 **Q.**  Pretty strong statement?

1    **A.**  Very.

2    **Q.**  Now, when we're talking about her father, are we talking

3    about Terry Pulham that testified here today?

4    **A.**  Yes, sir.

5    **Q.**  In regards to your investigation, did you also have

6    occasion to come in contact with an individual by the name of

7    Jennifer Hyde?

8    **A.**  Jessica Hyde, sir.

9    **Q.**  I apologize.  That was my mistake.  I apologize.  Jessica

10   Hyde?

11   **A.**  Yes, sir.

12   **Q.**  And when was it that you came in contact with Jessica Hyde?

13   **A.**  This morning.

14   **Q.**  Was that the first time that you attempted to reach

15   Ms. Hyde?

16   **A.**  No, sir.

17   **Q.**  How did you come in contact with Ms. Hyde?

18   **A.**  Also via telephone.

19   **Q.**  Tell us the circumstances of your telephone conversation

20   with Ms. Hyde.

21   **A.**  I was attempting to interview Ms. Hyde for the same or

22   similar purposes as having interviewed Crystal Pulham,

23   allegations of sexual molestation by the defendant in their

24   youth.

25   **Q.**  And could you tell us, please, what Ms. Jessica Hyde, first

1  of all, told you she was doing for a living currently?

2  **A.**  Yes, sir.  She's a soldier in the U.S. Army and has been

3  for the past 12 years.

4  **Q.**  Where is she currently stationed?

5  **A.**  I'm not familiar with her current duty station, sir.

6  **Q.**  Where is she currently living?

7  **A.**  Utah, sir.

8  **Q.**  What did she tell you in regards to her current situation

9  or status?

10 **A.**  She's currently going through a medical board process for

11 neurological injuries sustained resultant from a deployment to

12 Iraq.

13 **Q.**  Did you ask her anything about her relationship with the

14 defendant J.C. Pulham when she was a child?

15 **A.**  I did.

16 **Q.**  And what did she tell you?

17 **A.**  I began by letting her know that I was in possession of

18 police reports that basically indicated that she had said at

19 the age of 9 or 10 that J.C. had made her undress and at that

20 time had grabbed her private parts.  And when I told her that,

21 she said to me, "Oh, no, it was much more than that."  She went

22 on to tell me how she was a neighbor girl of the Pulhams and

23 from the ages of 9 to 10 she was molested by J.C.

24      What she recalls having done to her was being told to

25 strip nude in front of J.C., at which point he would stare at

1   her for enjoyment.  Over the course of the two years she

2   detailed to me how the molestation advanced from stripping down

3   nude in front of J.C. to being made to perform oral sex upon

4   him and finally to being made to engage in vaginal intercourse

5   with him.

6   **Q.**  During the recounting of this, what was Ms. Hyde's affect?

7   **A.**  Shock and disgust and brevity.

8   **Q.**  In regards to Ms. Hyde, at the time that she was 9, 10, 11

9   years old when this activity was occurring, did she tell you

10  how old Mr. J.C. Pulham was?

11  **A.**  She recalled him being 15 or 16 at the time.

12  **Q.**  So she's prepubescent at the time?

13  **A.**  That's correct.

14  **Q.**  In regards to the child pornography that you found on

15  Mr. Pulham's computer, approximately -- and again, I'm asking

16  for a rough approximation -- what was the rough approximation

17  of the number of the images -- either images or movies that you

18  discovered on equipment seized from Mr. Pulham?

19  **A.**  We discovered approximately 20 videos and approximately 110

20  images.

21  **Q.**  And of the 20 videos and 100 and some images that you

22  discovered, could you characterize for us, please, the

23  approximate age group of most of the children were that were

24  depicted in those videos?

25  **A.**  I would say they were approximately 9 to 12 years old.

DOCKET 15-CR-136-F          REINERT - CROSS                    44

1    **Q.**  Are you satisfied based upon the forensic evaluation of

2    Mr. Pulham's equipment that you have, in fact, found all of the

3    images of child pornography contained on those images?

4    **A.**  No, sir.

5    **Q.**  Why not?

6    **A.**  There is a folder upon the computer that the defendant

7    indicated we would find that is encrypted.  At the time of

8    interview, the defendant couldn't recall the password to this

9    encrypted file and to this date we've still been unable to gain

10   access to it.

11   **Q.**  How large a file it it?

12   **A.**  I'm not familiar with that, sir.

13   **Q.**  You have someone else helping you with the forensics, as I

14   recall?

15   **A.**  Yes, sir.

16          MR. ANDERSON:  I don't have anything else, Judge.

17   Thank you.

18          THE COURT:  All right.  Thank you.

19          This witness is passed for any examination by the

20   defendant.

21          MR. BARRETT:  Thank you, Your Honor.

22                        CROSS-EXAMINATION

23   BY MR. BARRETT:

24   **Q.**  With regard to Ms. Hyde, she admittedly at a very young age

25   apparently reported a single instance or allegation of abuse;

DOCKET 15-CR-136-F                    REINERT - CROSS                                    45

1    is that correct?

2    **A.**  I'm aware that she reported to her parents a single

3    instance, sir.

4    **Q.**  Did you review the DFS paperwork in this matter?

5    **A.**  Yes, sir, I did.

6    **Q.**  And with regard to Ms. Hyde, did you review that?

7    **A.**  Yes, sir.

8    **Q.**  And you know that Ms. Hyde's mother said that Ms. Hyde had

9    been seeing a therapist and that the therapist requested they

10   contact DFS.  Apparently what happened was a 15-year-old boy by

11   the name of J.C. Pulham was a neighbor down the street.  He

12   asked Jessica to remove her clothing.  He grabbed her between

13   her legs and also touched her breasts.  These are the only

14   details Mrs. Hyde knows.  She feels it was a one-time incident.

15           Are you aware of any other reports of any other

16   incidents prior to yesterday?

17   **A.**  No, sir.

18   **Q.**  Are you aware that the DFS work -- assessment worksheet and

19   result indicated that the parents of Ms. Hyde stressed or

20   indicated they felt this single incident occurred six months

21   prior to the report?

22   **A.**  I'm aware of what the report says, sir.

23   **Q.**  And then the result -- the risk assessment worksheet and

24   result in the case was that -- I don't know who wrote it, but

25   one of the investigators says, "It does not appear anything has

1    happened for almost a year.  Police are not filing any

2    charges."

3    **A.**   I've read it, sir.

4    **Q.**   Now, in fact, no charges were filed, were they?

5    **A.**   Not that I'm aware of, sir.

6    **Q.**   Then a year later come the allegations from Crystal; is

7    that correct?

8    **A.**   If I recall correctly, sir, the two police reports that I

9    have viewed were from 1988.

10   **Q.**   You've seen police reports?

11   **A.**   Yes, sir.

12   **Q.**   You talking about the DFS reports or police reports?

13   **A.**   They might be DFS reports, sir, with names of police

14   officers on there.  I could be confusing the two.

15   **Q.**   If you've reviewed the DFS reports you're familiar with

16   Crystal's allegations on April 10th of 1989 that from age 8 to

17   10 Crystal says that sexual intercourse took place in Payson.

18   Do you remember that?

19   **A.**   I recall reading it, sir.

20   **Q.**   Do you recall reading that Crystal said when her brother

21   molested her that there was actual intercourse?

22   **A.**   I recall reading that, sir.

23   **Q.**   But yesterday -- not yesterday -- I'm sorry -- that was

24   Ms. Hyde apparently about the 5th of this month in interviewing

25   Crystal, she said that there was no penetration?

1  **A.**  That's correct, sir.

2  **Q.**  Well, what -- he just -- you described spreading of the

3  vaginal lips and labia and other activity.  Was any of that

4  other sort of activity described by Crystal to DFS in 1989?

5  **A.**  Not that was reported, sir.

6  **Q.**  Is there unreported activity that you're aware of?

7  **A.**  Not that I'm aware of, sir.

8  **Q.**  We've had a good deal of conversation primarily in

9  cross-examination that J.C. went to Benchmark because he was

10  blaming his sister Crystal for victimizing him.  Do you recall

11  that?

12  **A.**  I recall reading that, sir.

13  **Q.**  You recall the question by Mr. Anderson?

14  **A.**  Yes, sir.

15  **Q.**  Okay.  What was the -- what prompted the admission to

16  Benchmark?

17  **A.**  According to the DFS reports, it was out of concern,

18  parental concern, for J.C.'s well-being.

19  **Q.**  On April 13th of 1989, it was reported to the DFS worker by

20  Lieutenant Carter who stated that J.C. is suicidal, according

21  to the school.  Do you recall that?

22  **A.**  I recall reading it, sir.

23  **Q.**  And this same officer five days later indicated that he had

24  interviewed J.C. and that in the 16 years he's been on the

25  police force he's never interviewed such a difficult

1    adolescent.  Do you remember that?

2    **A.**  I recall reading it, sir.

3    **Q.**  He denies everything, right?

4    **A.**  As it was written, sir.

5    **Q.**  Refuses to agree with the officer.

6            Now, also what was the admission history of the

7    present illness upon admission to Benchmark, do you know?

8    **A.**  No, sir.

9    **Q.**  Why don't I show you a summary of J.C.'s records from

10   Benchmark at the bottom of which is a History of Present

11   Illness.  Do you see that?

12   **A.**  I do, sir.

13   **Q.**  With permission of the Court, why don't you read that to

14   the Court.

15   **A.**  "This 17-year-old white male was admitted with the

16   allegation by his younger 14-year-old sister that he had

17   sexually abused her.  This had been apparent in terms of her

18   accusation and the patient's denial of this for approximately

19   three to four months.  The patient had been doing more poorly

20   in school, had great anxiety, and had trouble falling asleep.

21   He felt worthless, hopeless and helpless, and he had increased

22   guilt associated with one homosexual encounter two years before

23   and with increased guilt feelings associated with the sexual

24   seduction by a girlfriend of a friend at his school.  He had

25   difficulty concentrating.  His suicidal feelings were

1   increasing.  He could not fall asleep."

2   **Q.**  So the history, for purposes of admission, was that he was

3   being accused of sexual misconduct, correct?

4   **A.**  Yes, sir.

5   **Q.**  He was depressed?

6   **A.**  Yes, sir.

7   **Q.**  Suicidal?

8   **A.**  Yes, sir.

9   **Q.**  Now, Crystal also withdrew those allegations while J.C. was

10  at Benchmark, didn't she?

11  **A.**  Yes, sir.

12  **Q.**  Did she ever report to any hospital staff member that she

13  was being forced to do that by anyone?

14  **A.**  She told me she did, sir.

15  **Q.**  Is that the language in your report which says that

16  "Crystal stated she recalls telling a staff member verbatim

17  'I'm supposed to tell you the allegations I've made against

18  Pulham' are not true"?

19  **A.**  Yes, sir.

20  **Q.**  So she walked up to a staff member and said, "I'm supposed

21  to tell you those allegations aren't true"?

22  **A.**  As she told it to me, sir.

23  **Q.**  And the response from the staff member was "They aren't

24  true?" is that correct?

25  **A.**  Yes, sir.

DOCKET 15-CR-136-F          REINERT - REDIRECT                    50

1    **Q.**  To which Crystal angrily replied, "Listen to me.  I'm

2    supposed to tell you the allegations aren't true"?

3    **A.**  That's what I was told, sir.

4    **Q.**  So they may not have been true --

5    **A.**  Perhaps not, sir.

6    **Q.**  -- and she's supposed to tell them they're not true.  That

7    would be the right thing to do if they weren't true, wouldn't

8    it be?

9    **A.**  Yes, sir.

10          MR. BARRETT:  I believe that's all I have.  Thank you,

11   Your Honor.

12          THE COURT:  Thank you.

13          Any redirect?

14                        REDIRECT EXAMINATION

15   **Q.**  (BY MR. ANDERSON)   And, once again, in regards to when

16   Crystal told you, she didn't tell the staff folks at the

17   hospital, "I lied"; she said, "I'm supposed to tell you these

18   things didn't happen"?

19   **A.**  That's correct.

20          MR. ANDERSON:  Thank you.  I don't have anything else.

21          THE COURT:  Thank you.  You may step down.

22          MR. ANDERSON:  I've got nothing else to present on

23   this issue, Judge.

24          THE COURT:  All right.  Let's hear argument on the

25   state of the record as to the application of the specific

1    offense characteristic.  Who wishes to -- Mr. Barrett,

2    certainly welcome your argument, unless you want to have

3    Mr. Anderson go first.

4         MR. BARRETT:  No, Your Honor, I'll just respond if

5    necessary.

6         I think the issues set forth in this matter and with

7    regard to this particular specific offense characteristic are

8    very plain.  We have a young lady who gives different stories

9    about a 26-year-old unsuccessful allegation and perhaps even an

10   unsuccessful attempt to accuse her then -- not then -- he's

11   still her brother -- J.C. Pulham of not just sexual contact,

12   but intercourse; not just intercourse, but actual intercourse;

13   not just actual intercourse, but multiple times, which as of

14   yesterday has evolved itself to well, okay, maybe it was not

15   intercourse.  There wasn't any penetration; it was something

16   different, without any explanation as to why that conduct and

17   the description of that conduct changes.

18        It doesn't take much to say, geez, I just didn't know

19   what I was talking about when I was 14 years old, although she

20   knew what she was talking about well enough to have a child at

21   age 14 with a, quote, unquote, cocaine dealer.

22        Now, I'm happy she's doing well.  I'm happy she has a

23   job.  I'm happy she is hanging around juveniles, and I hope

24   she's a good mentor to them.  I hope she teaches them to use

25   specific language when they have something to say to her, for

1   example, "I'm being forced to lie," not, "I'm supposed to tell

2   the truth," not, "I'm supposed to let you know that none of

3   these things happened, but that I'm being forced to -- I'm

4   being forced to lie," which is what she told the probation

5   officer at the PSR report, that she reported, in quotes, "I'm

6   being forced to do this."  Not true.  It is not true on a bunch

7   of levels, but it is not because it is also the kind of

8   statement she can't keep track of while she's mentoring

9   juveniles in a correctional institution.

10          Then there's the implication that J.C. Pulham was at

11  Benchmark because they want to check and see if he's a pervert.

12  They want to check and see if he's a child molester.  Well,

13  they do.  And what happens during this examination?  The

14  so-called victim comes up and says, "I'm supposed to tell you

15  it is not true.  I'm supposed to tell you it is not true."  We

16  have no idea what the accent was.

17          What everyone wants you to say is as long as

18  there's -- as long as there are a number of allegations here,

19  that's good enough.  And as long as there's pieces of paper

20  that say there were allegations, that's good enough.  Well, it

21  shouldn't be.  I know the standard of proof in this particular

22  kind of case and this particular situation is quite low.  It is

23  a preponderance.  All of us in this room could probably get

24  away with saying, well, there is enough smoke here for me to

25  find this is all true and so I'm going to add five or ten --

1   five or six years to this man's sentence.  You know, believe

2   the children, even if none of the children's allegations have

3   ever been corroborated; no prosecutions, no medical evidence,

4   pure allegation, pure and simple.

5          What about Ms. Hyde?  She's a tough one.  She's got

6   two parents who cared about her, no further contact after 1989

7   and all of a sudden here comes this other stuff, although the

8   boy living around the corner, who, by the way, was friends with

9   her brother, is still there and nothing happens.  Is there any

10  indication that J.C. was told -- well, probably Jessica was

11  kept away from that house and so nothing happens for a year.

12  But we don't know if there was any other kind of contact at

13  all.  Nobody checked that.

14         You have a DFS report that accuses J.C. of having

15  intercourse and sexual contact with his younger sister Susan,

16  and nobody interviews Susan.  The whole thing is very peculiar,

17  but very consistent with the time in which these allegations

18  were made, the one failing being that they didn't prosecute.

19  And I say failing because it is different than what was

20  occurring back in those days because in those days any kid that

21  said a teacher touched them wrong -- wrongly or they killed

22  babies in the classroom and had witch craft celebrations,

23  everybody was prosecuted.  People went through days and weeks

24  and months of absolute hell because of false accusations,

25  recovered memories.

1          In this particular case it didn't even get that far.

2    But I have a clear recollection of those times.  It wasn't

3    easy.  Everybody got prosecuted, and it was unusual for people

4    not to be prosecuted.

5          But J.C. Pulham was admitted to Benchmark because of

6    generalized anxiety, depressive reagency, major depression

7    because of the accusations made against him.  If there's one

8    person who has been consistent during this entire time, this

9    last 26, 27 years, it is J.C. Pulham.  He says, "I did not do

10   these things."

11         Officer Carter, great insight into the -- into the law

12   enforcement psyche -- April 18th, 1989, 9:50 a.m., Lieutenant

13   Carter called and he reports, "In the 16 years he's been on the

14   police force he's never interviewed such a difficult

15   adolescent.  He denies everything and claims to be the victim

16   of his sister's vindictiveness.  Tried to act as if he was

17   schizophrenic."  I don't know how officer Carter knows any of

18   that.  Should have read this way, "In the 16 years he's been on

19   the police force he's never interviewed such a difficult

20   adolescent.  He doesn't agree with anything Lieutenant Carter

21   accuses him of."  That's what happened there.  And I'll bet it

22   was frustrating.  I bet it was really frustrating.

23         So here we are.  We put on the evidence for both

24   sides.  Now it is up to you, Your Honor, to decide whether or

25   not the allegations that there have been three hands-on -- you

1    know, that you can be -- you don't have to be super positive,

2    really positive, or absolutely certain.  But you have to be

3    reasonably certain that these things, in fact, occurred and

4    that has to be based on the evidence that you've heard here

5    today or that has been presented.

6          It is not a high burden, but it is an important one.

7    And it is these kinds of cases that require the most attention

8    and the greatest care because it is in these kinds of cases the

9    greatest harm can be done based on the least amount of

10   evidence.

11         There's no question J.C. Pulham is going to go to jail

12   for the crime that he pled guilty to.  But there should be a

13   significant question that he go to jail essentially twice for

14   another five years or whatever it is, or six years, based upon

15   26-year-old allegations that are contradictory and denied here

16   in this courtroom.

17         We can all do the "Why would they say that?  Why

18   wouldn't they?"  I don't know.  I'm not trying to read

19   anybody's mind.  I can only look at the record here and say

20   this is a mess.

21         And we can even believe that it is a mess that's true,

22   but it's a mess anyway.  And we can even believe that it is

23   such a mess that even if we believe it might be true, we can't

24   take the chance that a significant injustice will be done.  And

25   that's the kind of care we're asking Your Honor and that I know

1    Your Honor will exercise in this case.  Thank you.

2            THE COURT:  Thank you.

3            MR. ANDERSON:  If it please the Court, Mr. Barrett.

4            MR. BARRETT:  Mr. Anderson.

5            MR. ANDERSON:  It seems it gets down to this, Judge:

6    Two adult women have come forward.  One of them was interviewed

7    first by Mr. Olive and then by Agent Reinert, and the second

8    was then interviewed today by Agent Reinert, and they both

9    describe a period of time in their lives when they were being

10   sexually abused by the defendant.

11           If we were just talking about Crystal, because of all

12   the things that are swirling around here I could see where the

13   Court could have some question about whether or not it's more

14   likely than not that she was sexually abused by her brother.

15   But Crystal's testimony, or statements, coupled with the

16   statement of Jessica Hyde that she was sexually abused by the

17   defendant for an extended period of time, make the testimony --

18   make the evidence, I would say, compelling that the defendant,

19   in fact, engaged in a pattern of activity resulting in the

20   sexual abuse of children.

21           Is it old?  Yes.  But that legally speaking has no

22   relevance to your determination.  The fact that the defendant

23   was a juvenile when these events occurred has no legal

24   relevance to your determination.

25           And finally, the fact that there was no adjudication

1    in a juvenile court has no legal relevance to your

2    determination.  I would suggest to the Court that based upon

3    the statements made to Mr. Olive by Crystal Pulham, the

4    statement made by Crystal Pulham to Shannon Reinert and the

5    statement made to Shannon Reinert today by Jessica Hyde

6    demonstrate by a preponderance -- by greater than a

7    preponderance that the defendant, in fact, should -- his

8    sentence should be adjusted pursuant to 2G2.2(b)(5).

9         Be happy to answer any question that the Court might

10   have.

11        THE COURT:  Thank you.

12        MR. ANDERSON:  Thank you, Judge.

13        THE COURT:  Mr. Barrett.

14        MR. BARRETT:  Your Honor, I think, to be perfectly

15   straightforward, there may be one arguable -- arguable -- I do

16   not concede that it occurred, but one arguably valid, if

17   untrue -- and we know the truth has nothing to do with this --

18   complaint in, and that would be the one time contact between

19   Jessica Hyde and Mr. Pulham.  But it is often said, too, that's

20   not enough to impose the five levels.  The rest of it is a

21   mess, but -- and here's where we are.

22        Mr. Pulham is faced with the proposition that it

23   doesn't matter if he's convicted, it doesn't matter how old it

24   is and it doesn't matter how innocent or not guilty he may be,

25   what only matters is what these people say.  And as long as

1    they say it -- even if it is hearsay, as long as they're not

2    subject to cross-examination, which they're not, doesn't

3    matter; that none of the protections matter, none of the

4    protections apply.  All you have to do is say it and then the

5    defendant, Mr. Pulham and others, get to prove the negative:  I

6    didn't do it.  I was in Hawaii on vacation.  I was 15-years-old

7    and I wasn't at the house on that.  I don't know where I was.

8    I was playing basketball.  I was in Boy Scouts.  I was out of

9    the house.

10          That's about as singularly unfair a proposition as

11   even the Sentencing Commission has ever proposed.  There's no

12   process to protect anyone from doing an additional, what, five

13   years just on the -- on the say-so of a person who couldn't

14   support a prosecution by a preponderance and certainly not

15   beyond a reasonable doubt and certainly in the face of contrary

16   medical evidence.

17          You know, we can say that's the law and it probably

18   is, but we can't say it is right.  And we can't say it affords

19   any protection to a defendant or any assurance that the right

20   thing is being done, only a sort of gut feeling that we get

21   from outrage expressed on February 5th from Texas.  It doesn't

22   match up with anything else.

23          And additional -- additional stuff that's not reported

24   ever or prosecuted that, had it occurred, would certainly have

25   been the subject of significant interest in Ms. Hyde's case.

DOCKET 15-CR-136-F          ARGUMENT - BARRETT                    59

1    We have a counselor that says report it because an offense has

2    occurred.  That's what the psychologist was probably required

3    to do even then.  And what's reported?  One incident.  Police

4    are engaged.  They can't follow up or are not interested in it.

5    Who knows?

6           But all of that goes on in the background.  All

7    Mr. Pulham can do is hope against every bit of hope there is

8    that someone will take a look at this and say, "You know, I

9    just don't want to give somebody an extra four or five years

10   because of what I've seen and heard here."  Thank you.

11          THE COURT:  I did have one question for you,

12   Mr. Barrett.

13          MR. BARRETT:  Yes, ma'am.

14          THE COURT:  You mentioned someone by the name of

15   Jennifer Haines.  Was this a misstatement or did you mean

16   Jessica?

17          MR. BARRETT:  Jessica, it should be Jessica, Your

18   Honor.

19          THE COURT:  All right.  I wrote that name down and I

20   thought I don't know where that person fits in.

21          MR. BARRETT:  I keep wanting to call Benchmark

22   something else, too.  I have managed to avoid that so far.

23          THE COURT:  All right.  Thank you.

24          MR. BARRETT:  Thank you.

25          THE COURT:  Well, under the guidelines, the pattern

DOCKET 15-CR-136-F          FINDING OF THE COURT                    60

1  is applied where there's two or more occasions of sexual abuse

2  or sexual exploitation and as noted by both attorneys, the --

3  it doesn't matter whether the instances resulted in a

4  conviction or any adjudication.

5          The factors that seem persuasive to the Court in terms

6  of the application of this enhancement are the -- to begin

7  with, the instance reported by Jessica Hyde.  Whether that was

8  one or more instances, we have someone of a particular age that

9  correlates with the age of Crystal, and it also correlates with

10 the age of images found on the defendant's computer associated

11 with this particular offense.  The types of conduct detailed by

12 two separate individuals also is similar which seems to

13 corroborate the stories.

14         The testimony from Mr. Pulham and Ms. Johnson is a bit

15 indeterminant, and it is obvious that Susan has made every

16 effort to search her memory and doesn't -- doesn't remember

17 incidents.  That's understandable.  She was young.

18         Mr. Pulham, the testimony there is unusual.  You have

19 these accusations.  You have this turmoil in the home.  You

20 have enough to have a young man go off to a behavioral facility

21 and it seems as though Mr. Pulham's attitude was well, as long

22 as the police didn't arrest him or DFS didn't take him out of

23 the home, and that to me just seems like a strange approach for

24 a parental figure in the family to have taken with all this

25 turmoil going on, particularly where there's this reported

1   incident by Jessica Hyde.

2            And so I don't -- I don't find those witnesses

3   particularly persuasive in terms of what the point of their

4   testimony was.

5            I didn't hear Mr. Pulham testify that Crystal

6   victimized Mr. J.C. Pulham by her report.  It was like, well,

7   we -- the doctor couldn't tell us whether there was any

8   touching, and so it sort of seems to kind of go out into the

9   atmosphere as though that was the end of it, when certainly

10  sexual exploitation doesn't have to be sexual intercourse.  It

11  doesn't have to be really much of what was described by the

12  girls to amount to sexual exploitation.

13           So the statements by the grown women, Jessica and

14  Crystal, the age that they were at correlate and it correlates

15  with the images to which Mr. Pulham is attracted because of the

16  offense conduct associated with child pornography.  And so I

17  believe that the -- that it is more probable than not that the

18  defendant engaged in a pattern of activity, which is at least

19  two, involving the sexual abuse or exploitation of minors.

20           With that conclusion, I'll accept the Presentence

21  Report's findings of fact and put the following guideline

22  calculation on the record.

23           The guideline calculation for possession of child

24  pornography begins at a base offense level of 18.  The material

25  involved prepubescent minors and so a two-level increase is

DOCKET 15-CR-136-F          GUIDELINE FINDINGS                    62

1   applied.

2        The offense involved distribution, so another

3   two-level increase is applied.

4        The offense involved sadistic images, so four levels

5   are applied.

6        I've talked about the pattern of activities and will

7   apply the five-level enhancement.

8        I won't apply the computer enhancement.

9        Because of the number of images, the defendant

10  receives another five levels.  The offense involved more than

11  600 images so we're at offense level 36.

12       The defendant does receive a two-level reduction for

13  his timely acceptance of responsibility and a one-level

14  reduction for his assistance in the investigation and

15  prosecution of his conduct.

16       Therefore, with that we are at a total offense level

17  of 33.  And again, the explanation associated with the computer

18  enhancement is that it is my practice not to apply it.  I

19  disagree with the Sentencing Commission.  The heartland of

20  cases involve computers and that is not an unusual offense

21  characteristic, so to the extent that needs to be explained, it

22  will be explained by way of a variance.

23       To Mr. Pulham's credit -- he does have some criminal

24  history.  None is counted against him, and so he is in the most

25  favorable Criminal History Category, Category I.

1          That results in a guideline sentence of 135 to 168

2    months.

3          Other than objections noted relating to facts that are

4    contested and the Court's conclusions concerning the five-level

5    enhancement for pattern, are there additional objections to the

6    Court's recitation of the guidelines?  Mr. Barrett.

7          MR. BARRETT:  No, Your Honor.

8          MR. ANDERSON:  No, Your Honor.

9          THE COURT:  Mr. Anderson.

10          MR. ANDERSON:  No, thank you.

11          THE COURT:  All right.  Mr. Barrett, we've talked on

12    and off very persuasively about the length of the sentence.  I

13    would invite you to make your statement and argument on the

14    sentence sufficient, but not greater than necessary.  While

15    you're approaching the podium, I do have some letters that I

16    received today.  Let me go ahead and put them by summary

17    fashion in the open record and then they'll go into CM/ECF

18    unless there's some objection to these letters going into the

19    actual docket.

20          MR. BARRETT:  No.

21          THE COURT:   I have a letter from Jerry Simon, the

22    general manager for Knight's Inn who writes a very positive

23    letter about the decision he made to hire J.C., how he's never

24    been sorry or disappointed in the work, the positive

25    contributions J.C. has made during his time in employment, the

1    fact that he's never missed a day, the fact that he was open

2    about the charges.  And then Mr. Simon writes requesting

3    leniency and further goes on to say that he would be happy to

4    have him continue to work if that were possible in terms of the

5    disposition of the case.

6            I have a letter from Trina Pulham, Mr. Pulham's

7    spouse.  I actually have two letters.  One letter writes about

8    the support, financial and emotional support Mr. Pulham

9    provides to his family, some history about Mr. Pulham, work

10   history and otherwise.  She characterizes him as kind-hearted

11   and devoted, a diligent worker.  She talks about the work that

12   he does fostering ferel kittens.  She raises concerns about a

13   lengthy criminal sentence and how devastating that would be to

14   the family, what a hardship considering her situation.  And

15   she, too, has said that there's -- that the circumstances have

16   deteriorated her mental health.  She worries about time in

17   custody for her husband.  She asks if he does need to spend

18   time in custody he be allowed to self-surrender and talks about

19   the efforts she's making to become more self-sufficient.

20           And she concludes, in addition to asking for leniency,

21   reinforcing that they will be there, she and the children, to

22   support J.C. throughout this entire process.  Then she writes a

23   letter providing some history about her time with the Pulham

24   family, her time with Debbie, her concerns about Crystal, her

25   concerns about Crystal's truthfulness, how she doesn't believe

1   the accusations.  She talks about how long she's known Susan

2   Pulham Johnson and Mr. Pulham, J.C.'s dad, which is a

3   significant period of time, and that she mentions that none of

4   her -- their daughters have been subject to any sort of sexual

5   abuse and that he doesn't -- she has had no reason to suspect

6   her husband of any inappropriate behavior with her children or

7   other children and speaks about that in the context of the 23

8   years that she's known him and the family.

9            I have a letter from John Jaggerson who writes on

10  behalf of J.C. as a close friend.  He characterizes J.C. as a

11  kind and generous person, both as a friend and employee; how he

12  has been there for advice, has provided help and support and

13  how he's had the opportunity to hire J.C. a couple of different

14  times for different businesses that he's run.  He asks for

15  leniency as well and notes that J.C. should be in a -- should

16  be able to be left in a position to continue to support his

17  family and friends.

18           I have a letter from Kai Pulham, and Kai is -- notes

19  that J.C. is -- I am -- I'm not sure.  Is Kai a son?

20           THE DEFENDANT:  My oldest daughter.

21           THE COURT:  Oh, your oldest daughter.  How she's

22  J.C.'s dad -- or J.C. is her dad.  She apparently is like 22

23  years old now or somewhere in that vicinity.  She believes she

24  knows him as well as anybody does.  She is aware of the

25  circumstances and has discussed the case with both of the

1  parents.  She notes that J.C.'s been a good dad to her and the

2  sister -- and her sisters, how hard he works, how helpful and

3  friendly he is to guests and others.  She notes that her father

4  knows what he's done is wrong and that he wishes he could turn

5  back time and have made different choices.

6         She, too, asks that he be allowed to self-surrender to

7  wrap up some things that would be important and to -- along the

8  lines of her mother's statement as well, to give everyone a

9  proper chance to say good-bye.

10        And I have a letter from Deborah Pulham, Mr. Pulham's

11 mother.  And she -- she talks about Crystal as well and she is

12 concerned that no one called her to collect the information for

13 the Presentence Report.  She notes that J.C. was mostly a happy

14 child, how he learned to read at a young age, spent time with

15 books and scouting, how he achieved his Eagle Scout at the age

16 of 13, how hard it was when Terry and she were divorced and how

17 J.C.'s grades suffered, how they -- they don't live close, and

18 she doesn't have enough financially to visit often, but she

19 knows that he -- J.C. loves his wife and kids very much.  And

20 she notes that the family relies upon him and the difficulty

21 financially and emotionally it will be to be separated.  She

22 asks for leniency.

23        And then I think the last letter is from Ross Turner.

24 He talks about knowing what the charge is and he reassures the

25 Court that J.C. has never done anything negative or untoward

1    towards J.C.'s daughters.  He provides some history concerning

2    his -- his time.  And apparently he and his wife had physical

3    custody of J.C.'s two youngest daughters for a while and

4    perhaps currently.  He notes that they -- they -- that they

5    don't show any signs of any abuse.  He talks about the issue of

6    punishment and notes the -- and asks for leniency.  He, too,

7    writes about the employment and marketable skills that J.C.

8    has.  He believes that nothing is served by putting him in

9    prison for a lengthy period of time; that J.C.'s repentant,

10   that he should have an opportunity to move on as a husband and

11   father and how difficult it will be on his -- on J.C.'s family.

12            I guess Mr. Turner is a grandfather.  He refers to

13   himself as an old and tired grandfather.  He asks that this sad

14   situation not become a tragedy by way of a lengthy sentence.

15            Did I miss any letters, Mr. Barrett?  And again, I

16   always do a poor job summarizing them, but they will be --

17            MR. BARRETT:  Your Honor, I wonder if we might have a

18   five-minute recess.

19            THE COURT: I'm sorry?

20            MR. BARRETT:  I wonder if I might have a five-minute

21   recess.

22            THE COURT:  Yes, it is getting late.

23            MR. BARRETT:  I will be brief.  I need to discuss a

24   matter with Mr. Anderson as well, Judge.

25            THE COURT:  Okay.  Is five minutes adequate?  Why

1  don't we go ahead and take a -- we can take a recess until -- I

2  can't really read that clock -- but until like 4:40.  4:40,

3  okay?  All right.  We will stand in recess until 4:40.

4       (Recess taken 4:27 p.m. until 4:40 p.m..)

5            THE COURT:  Mr. Barrett.

6            MR. BARRETT:  Thank you, Your Honor.  If it please the

7  Court, I think the Presentence Report in all respects other

8  than those argued, of course, to the Court, is accurate and

9  sets forth a good picture of Mr. Pulham and his current

10 circumstances, as do the letters that the Court has referenced.

11           I'm not going to spend an awful lot of time on

12 sentence other than the sentence of 135 months at the low end

13 seems to me to be excessive given the circumstances.  And those

14 circumstances are that Mr. Pulham has been a reasonably good

15 citizen for a number of years, raised a family in spite of what

16 we want to believe or not believe about his past when he was 17

17 years old.  Since that time he's done apparently enough of a

18 job of turning his life around and keeping his life squared

19 away that his friends and employers really appreciate and

20 support him, as do many members of his family.

21           So the question is is a sentence at the low end of

22 this -- in this case, a sentence of 135 months, what's that, 11

23 years or thereabouts, sufficient, but not greater than

24 necessary?  And I would strongly suggest that it is much

25 greater than necessary given this possession charge to which

1    Mr. Pulham has pled.

2            What Mr. Pulham needs is a designation where he can

3    receive counseling for whatever drew him to obtain these images

4    in order to assure that, through supervision or otherwise, that

5    he will be motivated to stay out of jail.  And I'm sure that's

6    not an issue or a problem.  I don't have the sense that

7    Mr. Pulham is necessarily tremendously addicted to this

8    material, but certainly there's an attraction that he needs to

9    deal with.

10            Having said that, as the Court's announced the current

11   adjusted offense level -- or total offense level was 33,

12   Criminal History Category I with a low end of 135 months, I

13   would suggest to the Court that a sentence of eight years

14   rather than eleven, 96 or 97 months which would be at the low

15   end of offense level 30, is sufficient, but not greater than

16   necessary, to punish this offense.  And it is not such a

17   variance that it eliminates entirely the five levels that were

18   of concern to the Court, I'm sure, but, nevertheless, I think,

19   would apply for all intents and purposes a two-level bump for

20   the material that we discussed earlier during the hearing but

21   would also supply a significant punishment for the possession

22   charge in this case.

23            Haven't had any indication that the public is

24   tremendously interested, but certainly an eight-year sentence

25   is something in terms of public respect for the law and that is

DOCKET 15-CR-136-F        DISPOSITION - BARRETT                    70

1   for the possession of child pornography, not for child sexual

2   assault or manufacture or any of the more serious offenses.

3            And so I would ask Your Honor to vary downward from 33

4   to 30 and impose a sentence at the low end of that guidelines

5   which would be an eight-year sentence, just barely above that,

6   of 97 months which I think is sufficient.

7            There's no restitution required in this matter.

8   Mr. Pulham has no independent means by which to pay a fine

9   currently, although prisoner financial responsibility will

10  begin some of that should a fine be imposed.  But he can't pay

11  a fine within the advisory guideline range.  And his family is

12  going to have some difficulty in any event, even when he's

13  released.  We hope that they can eek out a living and get along

14  in the meantime, but certainly we don't want to impose any

15  additional burden on them that is already -- than they already

16  face.

17           With regard to supervised release, likely a

18  significant period of supervised release would be called for

19  simply for the purpose of Mr. Pulham being able to assure and

20  reassure this Court and the system that he's an individual who

21  responds to counseling, who lives a law-abiding life and who

22  can comply with the law.

23           No restitution.  We talked about fine.  Of course,

24  special assessment is mandatory.  Thank you, Your Honor.

25           THE COURT:  Thank you.

1          Mr. Anderson.

2          MR. ANDERSON:  Your Honor, when 2G2.2, the guideline

3    in this particular matter, was enacted, I think that the

4    primary concern of the Congress -- excuse me -- of the

5    Sentencing Commission and Congress in general was that

6    individuals that are drawn to this material -- to paraphrase

7    defense counsel, Mr. Barrett, people that are drawn to this

8    material have a strong and have demonstrated a strong sexual

9    interest in children.  And I think that the guideline -- the

10   thinking of the framers of the guideline at the time, the

11   primary and overriding concern was protection:  Protection of

12   children, protection of the community from individuals that

13   would prey upon the most vulnerable members of our community.

14          I think in this particular case -- and I know the

15   Court has heard me criticize and be critical of 2G2.2 in the

16   past.  It has been described by some commentators as a broken

17   guideline.  It has been criticized because it really doesn't

18   take into account the variability, the variation and the

19   differences in the broad spectrum of offenders that we see that

20   come before us in these cases.

21          And I think in this particular case, though, Judge, a

22   sentence close to and within the guideline is appropriate.  And

23   I'll give you my -- my thinking.

24          I think the overriding concern in this particular

25   matter should be protection, protection of the defendant's

1   11-year-old child and other -- and other children within his

2   community.  This is a crime of violence.  This is a crime

3   that -- we know individuals who engage in this type of crime

4   are prone to reoffend often, but this is a crime that

5   demonstrates more than any other crime an interest in children.

6          The average person that sees some of these images is

7   repelled and is repulsed.  Judge Johnson oftentimes refers to

8   these images as toxic, and I think that's a good descriptor.

9   An individual that would use this material to satisfy their

10  interest in children by means of masturbation is obviously

11  demonstrating an interest in children.

12         And in this case we even have stronger indication of

13  an interest in children as the defendant and as the Court has

14  found has demonstrated a sexual interest in children as he

15  acted on that when he was an adolescent, offending against a

16  prepubescent child, specifically the second -- the neighbor

17  girl, Jessica.

18         It seems to me that a sentence close to the guideline

19  would ensure, first and foremost, that the defendant's

20  11-year-old child will, in fact, go through the remainder of

21  her -- her prepubescent years and her early adolescent years

22  safe or at least protected from her father.

23         I would suggest to the Court that a sentence in the

24  guideline range will also protect other children who might come

25  in contact with the defendant.

1            The facts and circumstances, if you start looking at

2    the nature and the circumstances of this particular case --

3    well, the actual possession of the child pornography in and of

4    itself is fairly mainstream.  But what we don't have what we

5    often have, Judge, is some type of indication as to the

6    defendant's propensity to reoffend.  We don't have that.  We do

7    know that the defendant has offended in the past.  We have no

8    assurance that the defendant is amenable to treatment.

9            We essentially have a cipher in regards to defendant's

10   current state of mind.  All we can look at are his prior

11   actions.  The prior actions are the offenses when he was a

12   child and the offense now and also how he's acted in his life.

13   I would suggest to the Court that the defendant's life in

14   Evanston is very telling.  He lived a socially isolated life.

15   His children were home schooled.  Now, that's typically a very

16   laudable -- I've got no kick against anyone that decides public

17   schools aren't providing the education that they want for their

18   children.  But if you look at the defendant's background,

19   background of his life, and the conditions of their home at the

20   time that they were ostensibly or supposed to be home schooling

21   their youngest, one wonders what actually was the motivation

22   from keeping those children from the public and socializing

23   with others.

24           I suggest to the Court that that is a very, very

25   deeply concerning situation that the Court ought consider in

1    imposing a sentence that protects the defendant's child from

2    him.

3              We know about the defendant that he is a two-time

4    convicted felon.  We know about the defendant that, again, he

5    lived a life of isolation, of social isolation, and we know

6    that the defendant is an individual who, for lack of a better

7    term, is a pedophile.  I would suggest under those

8    circumstances and with the facts and circumstances of this case

9    and taking into account the factors that the Court must under

10   3553 that a sentence in the guideline range is appropriate and

11   should be imposed by the Court.

12             I'd be happy to answer any question that the Court

13   might have.

14             THE COURT:  Thank you.

15             MR. ANDERSON:  Thank you, Your Honor.  May I make -- I

16   forgot to say something.  I wanted to say this.  And I want to

17   put it on the record.  I wanted to tell the Court and I wanted

18   to compliment the Court and I wanted to compliment really not

19   so much the Court but the probation office in this particular

20   matter.

21             Mr. Olive's probation report in this particular matter

22   brought to light facts that were extraordinarily important to

23   everyone connected with this case, particularly to the Court

24   for purposes of imposing an appropriate sentence.  I've been

25   involved with other cases with Mr. Olive where he has gone

1  above and beyond, and he went above and beyond in this

2  particular case, and I think we are all lucky to have him.  I

3  don't want to sound obsequious in saying that.  I certainly

4  tease John Olive more than most anybody else in this building,

5  but he did a great job in this particular case, Judge, and I

6  think we're lucky to have him.

7          THE COURT:  Thank you.

8          Mr. Barrett, anything further before I call on

9  Mr. Pulham?

10         MR. BARRETT:  Yes.

11         Too late to not sound obsequious, Jim.

12         The strong being put up, we have to protect the

13  11-year-old daughter, from what?  From something, maybe, that

14  has never happened.  For up to 23 years these children have

15  been examined.  You know, the conditions of the home, okay,

16  we'll get a new vacuum cleaner; we'll shovel the place out.

17  That's not what he's charged with.  He's not charged with

18  untidy, extremely untidy housekeeping, and yet that's viewed as

19  some kind of danger.

20         You're not -- an eight-year sentence, even with good

21  time, what, the youngest daughter is going to be 17, 18 years

22  old, certainly not subject to any significant overriding of her

23  will.

24         And there's no indication that that's ever happened

25  with anyone else, including the oldest daughter Kai who said,

1    "Yeah, nothing like that ever happened.  He's been a good

2    father."  Well, what happened when he was 17, if it happened,

3    and he still denies it, but nevertheless, it's out there, that

4    accusation.  There's been nothing since, 26 years, 27 years.  I

5    guess there was some kind of incident in Spanish Fork, but not

6    a contact thing.

7         But, okay, let's cut -- just call it 20 years.  For 20

8    years he's held work, has employers who like him; he's got

9    family who supports him and family who recognizes that he's

10   going to jail, that he's going to prison, that what he did was

11   wrong.  Nobody is up here from the family saying, "Oh, no,

12   don't do it, Your Honor.  This is a terrible law and he's a

13   good man."  No, there are consequences.  But the consequences

14   shouldn't exceed the rational disposition for the offense.

15        When Mr. Pulham returns, one of the other best way --

16   I have an idea if you want to maintain supervision, supervise

17   him.  I don't think he's going to violate again.  I don't think

18   Mr. Anderson does either.  Certainly he talks about concern and

19   so out of concern we ought to add years, but that doesn't help.

20   If you added four years or five years, as Judge Brimmer used to

21   say, at least we know where you are.  But does that protect

22   anybody else in the future?  Not really.  I don't -- I'm not

23   suggesting that that's required here.

24        But if there's concern, that concern can be and should

25   be addressed through a long period of supervision and a

1    lifetime -- Mr. Pulham is subject to a lifetime of sex

2    registration.  All of those supervisory provisions are in

3    place.  They can do whatever they want, go to counseling.

4            And then the other -- and it is not only just the

5    guideline that's broken, it is the whole culture, the idea that

6    if you look at -- understandably we've got this stuff 20 years

7    ago or more.  But the idea that people who possess pornography

8    are pedophiles or that people who possess pornography are going

9    to assault children has been disproven time and time again.

10   It's just not true.  It happens, but only because the pedophile

11   is a pedophile first and a pornographer second.  In this case

12   we have a person who is interested in child pornography but no

13   other further evidence of assaultive behavior or improper

14   behavior.

15           The children are still available before release to

16   supervision to be forensically examined.  There are any number

17   of other devices that are available other than simple

18   warehousing.  And while Mr. Pulham is incarcerated, he will be

19   subject to and counseling will be available at that point.

20           So public -- the protection of the public assumes just

21   a catastrophic failure of the system, and that is something

22   that cannot and should not be made in this case, and Mr. Pulham

23   doesn't need a 11-year sentence in order to show that to be the

24   case.  Thank you.

25           THE COURT:  Thank you.

1          MR. BARRETT:  J.C.

2          THE COURT:  Mr. Pulham, if you have anything you wish

3    to say, I would welcome your comments.

4          THE DEFENDANT:  Thank you, Your Honor.  I have some

5    notes.  I'm not sure how much they'll help.

6          You mentioned in December that I should think of what

7    I might want to say, and I don't know if I'm any closer to that

8    than I was then, but I'll try.

9          I am sorry for what I did.  And not because I was

10   caught, but since then I've looked into some information about,

11   you know, where the victims come from and what happens to them

12   and I regret that I took part in that industry.

13          I -- I don't have much to say about Crystal.  It is

14   immaterial at this point, I guess, but a couple of weeks ago

15   Barrett did advise a deal for a set amount of time and I pushed

16   him to go forward with this because I would rather serve more

17   time for something that I didn't do in regards to Crystal and

18   Susan than to agree and make it sound like I did do it when I

19   didn't.  And I've always said so and will continue to for the

20   rest of my life.

21          I've never been accused of violence.  I've -- I

22   haven't been in a fistfight since I was in high school and some

23   kid hit me.  My youngest daughter, because of the situation of

24   our house when the warrant was served, has been with her

25   grandparents.  We -- my defense requested a forensic interview

1    for her, for Aspen, which they had done, and there was no

2    concerns and DFS has even stated at the last meeting that they

3    have no concerns that anything has ever happened to her.

4            And all of my other children were shocked to even be

5    asked that anything had ever happened to them.  That's

6    certainly a line I would never have crossed or would cross.

7            I am offended at the insinuation that my wife isn't

8    here because she doesn't care.  We have children.  It is

9    difficult.  It is a very long drive.  We usually come up the

10   night before and stay the night, so for my wife to come up and

11   leave our kids by themselves, even the two adult kids, you

12   know, she has a lot of concerns about that and about them and

13   wants to be there for them, especially right now.  They're --

14   sorry.  They're very upset as well and scared about what's

15   going to happen to me and what's going to happen to them.  So

16   we decided it was much more important for her to be there with

17   them than to try to go into even more debt to figure out how to

18   get everybody to be here.  But they were certainly willing if,

19   you know, money fell out of the sky, if I win the lottery.

20           I have done a lot of good things over the years.  I've

21   been an Eagle Scout.  I've, you know, worked to volunteer with

22   the Boy Scouts to help out where I can.  When I was managing

23   the Econolodge Motel, I helped out friends and people I didn't

24   know.  I tried to always make sure that the other groups in the

25   community had the cheapest rate that I could get the owner to

DOCKET 15-CR-136-F          JUDGMENT & SENTENCE                    80

1   agree to to put up people from Safe, from the Salvation Army,

2   from other church groups, from the local community when the

3   police brought people in who were homeless or stranded.

4           I've always tried to be a good husband and father.

5   Obviously I've fallen short, and I'll spend the rest of my life

6   trying to make up to them for that.

7           I plead for a downward departure, not for myself but

8   for my family, to be back with them as soon as I can, to take

9   care of them emotionally and financially.  Thanks for your

10  time.

11          THE COURT:  Thank you, Mr. Pulham.

12          MR. BARRETT:  Your Honor, the only other two matters I

13  might bring up is we would request a designation to Englewood,

14  Colorado.  And you had mentioned in one of the letters they

15  talked about a voluntary surrender.  We would ask that you

16  consider a voluntary surrender in this matter as well.  Thank

17  you.

18          THE COURT:  Thank you.  Well, as in all cases, the

19  sentencing objective is a sentence sufficient, but not greater

20  than necessary, as punishment.  This defendant suffers a number

21  of enhancements to his offense level that really drive the

22  sentence up.  And from the Court's perspective the additional

23  five levels for pattern, while I believe that enhancement is

24  properly applied, it seems particularly punitive considering

25  the amount of years that have passed, as Mr. Barrett has noted,

DOCKET 15-CR-136-F          JUDGMENT & SENTENCE                    81

1    since whatever -- whatever happened back then.

2              In considering the offense conduct and the defendant's

3    history and characteristics, I'm less concerned that this

4    defendant is a risk for future hands-on conduct.  I am a bit

5    worried that your proficiency with computers could make it a

6    little more of a challenge to supervise, but the probation

7    office through access and the limitations that are imposed and

8    the treatment that is available, both while in custody and

9    while on supervision, should minimize further interest in child

10   pornography.  The period of supervised release will be lengthy

11   enough to make sure that that's, indeed, the case.

12             I appreciate your comments that you have a better

13   appreciation of the impact viewing through the Internet has on

14   victims.  For many it may seem passive, but for the children

15   that have been victimized and then have those images stay on

16   the Internet accessible to others is just a revictimization,

17   and I appreciate your statements in that regard.

18             As to the length of time in custody, I'll vary three

19   levels and impose the 97 months.  From my perspective, that's

20   still a very long sentence.  I know your family will be

21   disappointed that more leniency wasn't given.  It's hard to

22   apply -- at least the circumstances are such that I'm reluctant

23   to apply more of a variance, and the reality is that, as I

24   said, the enhancements that routinely apply to child

25   pornography cases do drive the sentences up.

DOCKET 15-CR-136-F          JUDGMENT & SENTENCE                    82

1           But it is my view that will -- even if I was concerned

2     about the youngest daughter at home -- and I'm not really

3     concerned about any abuse or exploitation there, but if I were,

4     she'll reach an age that -- as Mr. Barrett has said, that would

5     allow her to not be subject to any kind of exploitation there.

6           With that explanation, I will state sentence.  The

7     Court granted a two-level variance to negate the effect of the

8     enhancement for use of a computer, as I conclude that nearly --

9     it is nearly universal in child pornography cases.

10          I'll grant an additional three-level variance to

11    reflect the fact that it seems as though the offense

12    characteristics have been overly enhanced considering the

13    particular -- in particular considering the five-level

14    enhancement and the age that the defendant appears on this

15    charge and the age that those accusations were lodged.  It

16    seems as though it is overly punitive and that some

17    consideration should be given to that.

18          The defendant did present through counsel a number of

19    very positive letters concerning his current characteristics as

20    a hard worker, caring and dedicated individual, both within the

21    family and in the community.  And so it is the Court's view

22    that the ultimate sentence of 97 months is sufficient, but not

23    greater than necessary.

24          Therefore, pursuant to the Sentencing Reform Act of

25    1984 and considering those factors set forth in 18 USC Section

DOCKET 15-CR-136-F          JUDGMENT & SENTENCE                    83

1    3553(a), it is the Judgment and Sentence of the Court that the

2    Defendant J.C. Christopher Pulham is hereby sentenced to a term

3    of 97 months in the custody of the Bureau of Prisons.  Upon

4    release from custody, the defendant shall be placed on

5    supervised release for a term of ten years.

6          Within 72 hours of release from the custody of the

7    Bureau of Prisons, the defendant shall report in person to the

8    probation office in the district to which he's released.

9          While on supervised release, the defendant shall

10   comply with the mandatory and standard conditions of

11   supervision adopted by this Court, except that mandatory drug

12   testing is waived.

13         The probation officer will provide state officials

14   with any and all information required by the state sex offender

15   registration agency and may direct the defendant to report to

16   that agency personally for additional processing such as for

17   photographing and fingerprinting.

18         In addition, due to the nature of the offense,

19   conditions will be imposed to address the risk of future

20   sexually deviant behavior, including limitations on computer

21   use, numbers of computers, restrictions on associating with

22   minor children or vulnerable adults and sex offender treatment.

23         Given the nature of the offense, a condition is also

24   imposed to address any cognitive thinking errors, and primarily

25   to address officer safety, a search condition will be imposed.

1          Therefore, the following special conditions are

2     recited:  The defendant shall not access the Internet with any

3     device unless such device has filtering software installed that

4     has been approved by the probation office.  The defendant shall

5     not make any attempt to conceal or erase the names of sites

6     visited and shall configure any computer he uses to retain

7     history for at least 30 days.

8          The defendant shall not possess, send or receive any

9     pornographic, sexually oriented or sexually stimulating visual,

10    auditory, telephonic or electronic signs, signals or sounds

11    from any source unless part of a treatment regimen.  He shall

12    not visit bulletin boards, chatrooms or other Internet sites

13    where any pornographic, sexually oriented or sexually

14    stimulating images or messages are discussed.  He shall not

15    send or receive e-mail or other documents discussing any

16    pornographic, sexually oriented or sexually stimulating images

17    or messages.

18         The defendant shall not use or possess any computer

19    not authorized by the U.S. Probation Office.

20         The defendant shall consent to having installed on his

21    computer at his own expense any hardware or software systems to

22    monitor computer use.

23         The defendant may be limited to possessing only one

24    personal Internet-capable device to facilitate effective

25    monitoring of his Internet-related activities.

1        The defendant shall consent to the probation office

2   conducting periodic unannounced examinations of his computers,

3   hardware, software and other electronic devices which may

4   include retrieval and copying of all data from his computer.

5   This also includes the removal of such equipment if necessary

6   for the purpose of conducting a more thorough inspection or

7   investigation.

8        The defendant shall agree to sign and abide by the

9   forensic intake agreement and the computer use agreement

10  provided by the probation office.  For the purposes of this

11  condition, the term "computer" is defined at 18 USC Section

12  1030(e) which includes, but is not limited to, traditional

13  computers, cellular phones, Internet tablets and game machines

14  and related accessories.

15       The defendant shall participate in and successfully

16  complete sex offender treatment in a program approved by the

17  U.S. Probation Officer and abide by the rules, requirements and

18  conditions of the treatment program.  The defendant shall not

19  discontinue treatment without the permission of the U.S.

20  Probation Officer.  This program may include polygraph testing.

21       The defendant shall not associate with any child under

22  the age of 18 or mentally or physically vulnerable adults

23  except in the presence of a responsible adult who is aware of

24  the nature of the defendant's background and current offense

25  and who has been approved by the probation officer.

1       The defendant shall register with the state sex

2   offender registration agency in any state in which he resides,

3   is employed, carries on a vocation, or is a student as directed

4   by the U.S. Probation Officer.

5       The Court orders as an explicit condition of

6   supervised release for the defendant who is a felon and

7   required to register under the Sex Offender Registration and

8   Notification Act that he submit his person and any property,

9   house, storage facility, residence, vehicle, papers, computer

10  and other electronic communications or data storage devices or

11  media and effects to a search at any time with or without a

12  warrant by any law enforcement or probation officer with

13  reasonable suspicion concerning a violation of a condition of

14  supervised release or unlawful conduct by the person and by any

15  probation officer in the lawful discharge of the officer's

16  supervision functions.

17      As a component of the defendant's treatment and

18  testing program, the defendant shall pay a one-time fee of $750

19  to partially defray the costs of sex offender treatment.

20  Monetary payments made by the defendant shall be applied to

21  this fee only after all other court-ordered monetary

22  obligations are fulfilled.

23      Payment of the fee shall be by money order or

24  cashier's check, payable to the Clerk of the District Court and

25  mailed to the address shown on the payment coupon.  This

DOCKET 15-CR-136-F          JUDGMENT & SENTENCE                          87

1    condition is waived if the defendant is supervised by a

2    district other than Wyoming.

3         The defendant shall participate in a cognitive

4    behavioral treatment regimen which may include, but is not

5    limited to, moral reconation therapy, cognitive thinking,

6    Thinking For A Change or interactive journalling.

7         The defendant shall actively participate in treatment

8    until successfully discharged or until the U.S. Probation

9    Officer has excused the defendant from the treatment regimen.

10        The defendant shall be prohibited from using any form

11   of encryption, cryptography, steganography, compression,

12   password-protected files that may limit access to or change the

13   appearance of data and/or images without prior written

14   permission from the supervising officer.

15        If for work purposes password protection is required

16   on any system or files used by the defendant, the password

17   shall be provided to the supervising officer or the officer's

18   designee upon request.

19        The Court finds that restitution is mandatory;

20   however, no request for restitution has been made from any

21   identified victims.

22        The Court finds the defendant does not have the

23   ability to pay a fine within the guideline range, but he can

24   pay a reduced fine and a fine of $300 is imposed, inclusive of

25   penalties and interest, if applicable.

DOCKET 15-CR-136-F          JUDGMENT & SENTENCE                    88

1          It is ordered that the defendant shall pay a special

2     assessment fee of $100 which is due immediately.  Payments for

3     monetary obligations shall be made payable by cashier's check

4     or money order to the Clerk of the District Court, 2120 Capitol

5     Avenue, Second Floor, Cheyenne, Wyoming, 82001.

6          The defendant shall participate in the Inmate

7     Financial Responsibility Program to pay his monetary

8     obligations.  Any amount not paid immediately shall be paid

9     while in custody in the amount of $25 per quarter.  Any amount

10    not paid immediately or while in custody shall be paid

11    commencing 60 days after the defendant's release from custody

12    in monthly installments of not less than $25, or 10 percent of

13    the defendant's gross monthly income, whichever is greater.

14         All monetary obligations shall be satisfied no later

15    than 60 days prior to the expiration of the defendant's term of

16    supervised release.

17         The defendant is advised that he has 14 days from the

18    date of entry of judgment to file a Notice of Appeal.

19         I will include in the statement of judgment a

20    recommended designation to Englewood for the convenience of

21    family in terms of visitation as well as for programming

22    available there.

23         Other than reasons previously argued, is there -- and

24    those that are preserved in the record, are there any reasons

25    why the sentence should not be imposed as stated?

1          Mr. Barrett.

2          MR. BARRETT:  No, Your Honor.

3          THE COURT:  Mr. Anderson.

4          MR. ANDERSON:  No, Your Honor.  Thank you.

5          THE COURT:  All right.  For the Government, I believe

6   we have a remaining count in the Indictment.

7          MR. ANDERSON:  Move to dismiss, Your Honor.

8          THE COURT:  Is that Count 2?

9          MR. ANDERSON:  It is indeed Count 2, Judge.  Just want

10  to make sure.  Count 2 is the receipt charge, Your Honor.

11  Would move to dismiss at this time.

12         THE COURT:   Count 2 is dismissed.

13         We have a request for self-surrender.

14         MR. BARRETT:  Yes, Your Honor.

15         THE COURT:  From the Government.

16         MR. ANDERSON:  Can't do it or I can't go along with

17  that, Judge.  I think 3143 paragraph (b) is very clear.  The

18  defendant must be taken into custody today.

19         THE COURT:  Mr. Barrett.

20         MR. BARRETT:  All I can say with regard to that is

21  that Mr. Pulham has had absolutely no difficulty while on bond

22  or bond supervision.  He has maintained employment and, as

23  indicated in the letters from the family, they would like some

24  reasonable period of time within which to organize and say

25  their good-byes.  Mr. Pulham will be gone for a significant

DOCKET 15-CR-136-F          JUDGMENT & SENTENCE                    90

1   period of time, we hope only to Englewood, if you can call it

2   that, but that it may be some other location so by the time his

3   designation is here we don't know whether he will be in Texas

4   or Colorado, but we hope Colorado.

5          THE COURT:  Well, I agree with the Government.  There

6   is no basis for self-surrender in this case adequate to meet

7   the statutory criteria.

8          I know that's a disappointment to you, Mr. Pulham, and

9   I'm sorry.  And I know it will be devastating to your family as

10  well.  Please know that I certainly did not take in any way

11  negative the fact that your wife is not here.  I know what it

12  is like to have children at home and I know that you have to

13  make choices, and so that had no bearing on any of my decisions

14  today.  I don't want her to worry.  Otherwise -- she wrote two

15  lengthy letters.  She obviously loves you and you're lucky to

16  have her.

17         THE DEFENDANT:  She spent a lot of time trying to get

18  those written.

19         THE COURT:  Well, they were very well written and very

20  thorough, and you're lucky to have such a strong support

21  system, to have family here and to have a wife and daughters

22  that stand behind you.

23         At this time, under the statute I'll remand you to the

24  custody of the Marshal Service.

25         We'll stand in recess until call.

1          (Proceedings concluded 5:21 p.m., February 18, 2016.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          C E R T I F I C A T E

2

3

4

5              I, JANET DAVIS, Federal Official Court Reporter for

6    the United States District Court for the District of Wyoming, a

7    Registered Diplomate Reporter and Federal Certified Realtime

8    Reporter, do hereby certify that I reported by machine

9    shorthand the foregoing proceedings contained herein on the

10   aforementioned subject on the date herein set forth, and that

11   the foregoing pages constitute a full, true and correct

12   transcript.

13

14             Dated this 31st day of March, 2016.

15

16

17

18                         */s/ Janet Davis*

19             _____

20                         JANET DAVIS
                       Registered Diplomate Reporter
21                 Federal Certified Realtime Reporter
                       United States Court Reporter
22

23

24

25